# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA; STATE OF
CALIFORNIA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF FLORIDA; STATE
OF GEORGIA; STATE OF HAWAII; STATE
OF ILLINOIS; STATE OF INDIANA; STATE
OF IOWA; STATE OF LOUISIANA; STATE
OF MARYLAND; COMMONWEALTH OF
MASSACHUSETTS; STATE OF MICHIGAN;
STATE OF MINNESOTA; STATE OF
MONTANA; STATE OF NEVADA; STATE
OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE
OF NORTH CAROLINA; STATE OF
OKLAHOMA; STATE OF RHODE ISLAND;
STATE OF TENNESSEE; STATE OF TEXAS;
COMMONWEALTH OF VIRGINIA; STATE
OF WASHINGTON; STATE OF WISCONSIN;
and THE DISTRICT OF COLUMBIA;
*ex rel.* ANTONIO S. MONTECALVO
     183 Burnside Avenue
     Seekonk, Massachusetts 02771,

     Plaintiffs,

v.

SHIRE REGENERATIVE MEDICINE, INC.
F/K/A ADVANCED BIOHEALING, INC.,
     11095 Torreyana Road
     San Diego, California 92121,

     Defendant.

8: 16-CV-268-T-27TBM

**CIVIL ACTION NO.**

_____

**FILED *IN CAMERA* AND
UNDER SEAL**

PURSUANT TO
31 U.S.C. S 3730(b)(2)

**JURY TRIAL DEMANDED**

February 14, 2014

## FALSE CLAIMS ACT *QUI TAM* COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE ACTION .................................................................................1

JURISDICTION AND VENUE ...........................................................................11

THE PARTIES ....................................................................................................12

FEDERAL AND STATE LAWS AND REGULATIONS .......................................14

    A.    The Anti-Kickback Laws of the United States and the States ............14

    B.    The Federal and State False Claims Acts.............................................21

    C.    The Federal Food, Drug, and Cosmetic Act.........................................26

    D.    Co-Payment Assistance Funds .............................................................28

GOVERNMENT HEALTH INSURANCE PROGRAMS.......................................31

THE RELATOR ..................................................................................................38

PRODUCTS MANUFACTURED AND SOLD BY DEFENDANT......................40

CODING SYSTEMS RELEVANT TO ABH'S FRAUDULENT CONDUCT ......43

CODING FORMS SUBMITTED TO GOVERNMENT HEALTH CARE PROGRAMS......................................................................................................53

ABH'S NATIONAL FRAUD SCHEME TO INDUCE SALES OF DERMAGRAFT ...............................................................................................54

    A.    ABH Provided Kickbacks to Medical Providers To Induce Purchases of Dermagraft .......................................................................55

    B.    ABH's Improper Marketing Encouraged Off-Label Use of Dermagraft...........................................................................................65

    C.    ABH Induced Medical Providers To Purchase Dermagraft Based on Representations Regarding Profitability .........................................72

    D.    ABH Encouraged Medical Providers To Bill Improperly By Misusing CPT and ICD-9-CM Codes To Induce Sales of Dermagraft...........................................................................................79

E.    ABH Intentionally Inflated the Dermagraft ASP ................................. 89

ABH KNEW ITS CONDUCT CAUSED FALSE CLAIMS ................................... 93

CLAIMS SUBMITTED AND DAMAGES CAUSED TO GOVERNMENT
HEALTH CARE PROGRAMS ................................................................................ 97

CLAIMS FOR RELIEF ......................................................................................... 103

COUNT 1: VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C.
§ 3729(a)(1)(A) ..................................................................................................... 103

COUNT 2: VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C.
§ 3729(a)(1)(B) ..................................................................................................... 105

COUNT 3: VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31
U.S.C. § 3729(a)(1)(G) ........................................................................................ 107

COUNT 4: VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT ......... 110

COUNT 5: VIOLATION OF THE COLORADO MEDICAID FALSE
CLAIMS ACT ....................................................................................................... 112

COUNT 6: VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT ..... 115

COUNT 7: VIOLATION OF THE DELAWARE FALSE CLAIMS  AND
REPORTING ACT ................................................................................................. 119

COUNT 8: VIOLATION OF THE FLORIDA FALSE CLAIMS ACT ................ 122

COUNT 9: VIOLATION OF THE GEORGIA TAXPAYER PROTECTION
FALSE CLAIMS ACT ........................................................................................... 124

COUNT 10: VIOLATION OF THE HAWAII FALSE CLAIMS ACT ................. 127

COUNT 11: VIOLATION OF THE ILLINOIS FALSE CLAIMS ACT .............. 130

COUNT 12: VIOLATION OF THE INDIANA FALSE CLAIMS AND
WHISTLEBLOWER PROTECTION ACT ........................................................... 133

COUNT 13: VIOLATION OF THE IOWA FALSE CLAIMS ACT ..................... 135

COUNT 14: VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE
PROGRAMS INTEGRITY LAW .......................................................................... 138

ii

COUNT 15: VIOLATION OF THE MARYLAND FALSE HEALTH CLAIMS ACT ................................................................142

COUNT 16: VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT ................................................................145

COUNT 17: VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT ................................................................148

COUNT 18: VIOLATION OF THE MINNESOTA FALSE CLAIMS ACT ........150

COUNT 19: VIOLATION OF THE MONTANA FALSE CLAIMS ACT ...........153

COUNT 20: VIOLATION OF THE NEVADA FALSE CLAIMS ACT ...............156

COUNT 21: VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT .......159

COUNT 22: VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT ................................................................161

COUNT 23: VIOLATION OF THE NEW YORK FALSE CLAIMS ACT ..........164

COUNT 24: VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT ................................................................167

COUNT 25: VIOLATION OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT ................................................................169

COUNT 26: VIOLATION OF THE RHODE ISLAND STATE FALSE CLAIMS ACT ................................................................172

COUNT 27: VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT ................................................................175

COUNT 28: VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION ACT ................................................................178

COUNT 29: VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT ................................................................181

COUNT 30: VIOLATION OF THE WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT ................................................................184

COUNT 31: VIOLATION OF THE WISCONSIN FALSE CLAIMS FOR
MEDICAL ASSISTANCE LAW ........................................................................... 187

COUNT 32: VIOLATION OF THE DISTRICT OF COLUMBIA FALSE
CLAIMS ACT ...................................................................................................... 189

PRAYERS FOR RELIEF ....................................................................................... 192

8

## NATURE OF THE ACTION

1.      Plaintiff Antonio S. Montecalvo (hereafter referred to as "Relator")
brings this action on behalf of the United States of America against Defendant
pursuant to the *Qui Tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-
3733 ("Federal FCA" or "FCA"), and on behalf of the above-captioned states
under their respective State False Claims Acts ("State FCAs") (together referred to
herein as the "*Qui Tam* Action").  Pursuant to 31 U.S.C. § 3730(b)(2), and
comparable provisions in the State FCAs, this *Qui Tam* Action is brought *in
camera* and under seal.

2.      Relator is the Director of Customer Support Services at
Organogenesis, Inc. ("Organogenesis").  Organogenesis sells Apligraf®
("Apligraf"), an advanced treatment for healing wounds that is created from cells
found in healthy human skin.

3.      In the course of his employment with Organogenesis, Relator has
learned and observed, in documents and emails, the conduct of sales
representatives and other employees of Defendant Shire Regenerative Medicine,
Inc. f/k/a Advanced BioHealing, Inc. ("ABH"), in selling, marketing, and
promoting DERMAGRAFT® ("Dermagraft"), a product that competed with
Apligraf at all times relevant to this Complaint.

9

4.     The allegations of this Complaint arise from Relator's knowledge of the unlawful practices of ABH with respect to its marketing and sale of Dermagraft.

5.     As more fully described below, Dermagraft is a cryopreserved single-layer dermal substitute manufactured from donated human skin tissue. It is a Class III medical device that is approved by the Food and Drug Administration ("FDA") to treat full-thickness diabetic foot ulcers greater than six weeks duration, which extend through the dermis, but without tendon, muscle, joint capsule, or bone exposure. Dermagraft is FDA-approved for up to 8 applications in 12 weeks, as long as the wound is healing.

6.     Millions of people in the United States suffer from chronic wounds, such as diabetic foot ulcers, venous leg ulcers, and pressure ulcers. The American College of Foot and Ankle Surgeons estimated that approximately 2.4 million diabetes patients, or nearly 15% of the estimated 16 million Americans with diabetes, will develop a serious foot ulcer during their lifetime.

7.     These sorts of chronic wounds can impair mobility, diminish quality of life, and require amputation of extremities.

8.     Generally, patients with chronic wounds first receive conventional treatments based on traditional wound care methods, such as infection control,

2

10

keeping pressure off the wound, wound bed preparation, and establishing moisture balance. Often, however, these treatments do not adequately heal chronic wounds.

9.      A more aggressive approach is medically necessary in approximately one-third of cases involving chronic wounds. A May 17, 2011, press release by Shire plc – of which ABH is a wholly owned subsidiary – reported that slow-healing diabetic foot ulcers affect approximately 538,000 people annually in the United States. These wounds are candidates for advanced interventions, such as Dermagraft and Apligraf.

10.     ABH manufactured, marketed, and sold Dermagraft to medical providers in bulk, as opposed to per patient. Dermagraft could be stored in a freezer until administered to a patient.

11.     From on or around February 15, 2007, until on or around January 16, 2014, ("the relevant period") ABH manufactured, marketed, and sold Dermagraft to medical providers.

12.     During the relevant period, medical providers including, without limitation, hospitals and physicians, purchased Dermagraft directly or indirectly from ABH.

13.     During the relevant period, Dermagraft was administered (*i.e.*, applied) to patients by physicians or health care providers skilled in wound care.

3

11

14.   In most, if not all cases, medical providers thereafter sought
reimbursement for the Dermagraft product administered to patients and medical
procedures provided relating to the administration of Dermagraft to patients, often
by submitting a claim to federal and state governmental health insurance programs,
including, without limitation, Medicare and Medicaid. (These programs are herein
referred to as "Government Health Care Programs.").

15.   As a direct, proximate, and foreseeable result of Defendant's
fraudulent course of conduct set forth herein and conducted on a national scale,
Defendant knowingly caused the submission of thousands of false or fraudulent
statements, certifications, and claims to Government Health Care Programs for the
reimbursement of Dermagraft product administered to patients, and medical
procedures provided relating to the administration of Dermagraft to patients, from
on or around February 15, 2007, until on or around January 16, 2014.

16.   Based on information known to Relator as a result of his employment
at Organogenesis, the practices complained of herein continued until on or around
January 16, 2014. As detailed below, Defendant's actions and omissions have
caused many years of improper and illegal billings to the United States and the
above-captioned states.

17.   On information and belief, total sales revenue from Dermagraft during
the relevant period totaled between approximately $600 million and $850 million.

4

12

18.    According to ABH's website for Dermagraft, more than "90,000 patients have received Dermagraft since 2007." Dermagraft Website, Proven DFU results and extensive DFU experience, *available at* http://www.dermagraft.com/proven-results/ (accessed Feb. 9, 2014).

19.    By its actions, Defendant violated several laws, including, without limitation, the FCA and the Medicare and Medicaid Patient Protection Act (also known as the "Anti-Kickback Statute" or "AKS").

20.    Through its fraudulent scheme, ABH sought to encourage sales of, and gain market share for, Dermagraft over other biological dermal substitute products used to treat chronic wounds, such as Apligraf. Defendant intended to take, and took, action to shift prescribers from Apligraf to Dermagraft for all manner of treatments of chronic wounds, including for treatment of full-thickness diabetic foot ulcers greater than six weeks duration, which extend through the dermis, but without tendon, muscle, joint capsule, or bone exposure, as well as off-label treatments, such as treatment of burns and ulcers located on various areas of the leg.

21.    ABH's fraudulent scheme included offering illegal kickbacks to medical providers, marketing Dermagraft for off-label use, unlawful inducement to purchase Dermagraft based on representations about its profitability, misuse of medical codes that medical providers submitted to Government Health Care

5

Programs in order to receive payments, and deliberately inflating Dermagraft's

Average Sales Price ("ASP").

22.     ABH's unlawful scheme involved providing kickbacks to medical

providers in the form of, among other things, cash, gifts, gift cards, food, event

tickets, trips, and risk-free trials of Dermagraft – all of which were designed to

induce medical providers to purchase and use Dermagraft, rather than other

products. ABH's employees presented these kickbacks to potential purchasers of

Dermagraft through various means, including, without limitation, by directly

giving gifts, gift cards, food, and event tickets; paying for trips that had no

connection to Dermagraft or any educational function; illegally compensating

physicians for speaking engagements and/or for sham research at rates that far

exceeded fair market value; and financially sponsoring holiday and bowling

parties. ABH's provision of gifts or services, free-of-charge, to physicians in order

to encourage their use of Dermagraft constituted improper kickbacks from ABH to

physicians in exchange for physicians purchasing Dermagraft and prescribing it to

their patients.

23.     As part of its scheme, ABH also marketed Dermagraft for off-label

use, such as for treatment of ulcers above the foot and for applications of

Dermagraft after a patient's wound had healed, such that further applications were

medically unnecessary. Defendant engaged in such conduct, pressing medical

6

providers to overuse Dermagraft, despite knowledge (included on the Dermagraft label) that Dermagraft was approved by the FDA for treatment of a narrower set of ulcers than ABH included in marketing materials. *See* Dermagraft Proposed Labeling, at 2, *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000036c.pdf (Sept. 26, 2001) (providing Dermagraft's indications). These actions in pressing off-label use of Dermagraft are contrary to appropriate medical practice and represent a departure from the care permitted and expected from medical professionals. They also demonstrate the misbranding of Dermagraft through ABH's sales of Dermagraft with the intention that it be used for unapproved purposes, the knowledge it would be used for such purposes, or both.

24.    As is explained by way of example in this Complaint, Defendant's actions involved, among others, concerted efforts to (a) misbrand Dermagraft by encouraging medical providers throughout the United States to (i) base their clinical decisions on misinformation, such as presentation of the purported value of Dermagraft versus other skin substitute products, such as Apligraf, and/or "special" incentives offered to Dermagraft purchasers who contracted with ABH, and (ii) to dose patients with Dermagraft in various unsafe or off-label manners, as well as (b) to cause providers throughout the United States to submit overstated claims relating to Dermagraft administration in a fraudulent manner.

25.     ABH also induced medical providers to purchase Dermagraft based on representations about the profits providers could realize from treating patients with Dermagraft.  ABH's marketing materials emphasized Dermagraft's profitability and compared its profitability to the profits medical providers could earn by treating patients with Apligraf, instead of marketing based on efficacy, clinically proven standards, or medical necessity.  In doing so, ABH emphasized that Dermagraft required more applications than Apligraf, which would result in greater revenue to medical providers.  This type of marketing occurred on numerous occasions during the relevant time period.  It resulted in medically unnecessary Dermagraft treatments and caused the submission of false or fraudulent claims.

26.     Moreover, ABH induced medical providers to purchase Dermagraft by suggesting creative ways to misuse medical codes that providers submitted to Government Health Care Programs in order to receive payments.  Specifically, it encouraged medical providers to submit codes that corresponded to treatments medical providers did not provide, causing providers fraudulently and unlawfully to double- and sometimes triple-bill Government Health Care Programs.

27.     ABH inflated Dermagraft's ASP in numerous ways in order to induce medical providers to purchase Dermagraft.  For example, ABH provided discounts for purchases of Dermagraft through risk-free trials of the product, allowed

customers to return unused Dermagraft at no charge, wrote off patient co-pays, forgave providers' obligations to pay for Dermagraft when they failed to receive payment from Government Health Care Programs to cover the cost, offered to reimburse physicians for payments relating to Dermagraft that Government Health Care Programs denied, and even paid providers per piece of Dermagraft they purchased. Defendant engaged in these acts without submitting them as discounts in computing the reportable sales price of Dermagraft for purposes of obtaining reimbursement from government and other health care programs, including Medicare and Medicaid. Consequently, Defendant knowingly inflated Dermagraft's ASP used to determine reimbursement values from Government Health Care Programs. Defendant's scheme thus allowed Dermagraft purchasers to obtain Dermagraft at a price that was significantly lower than the price used to calculate the ASP used by government programs for reimbursing sales of Dermagraft. Purchasers of Dermagraft thus also received higher reimbursement from Medicare and Medicaid because of this aspect of Defendant's fraud.

28.     Defendant's misconduct involved the deliberate targeting of medical providers who could provide lucrative business for Defendant through the purchase of Dermagraft, as well as medical providers who could influence other providers to provide Dermagraft to, or to prescribe Dermagraft for, their patients.

9

29.     In addition to causing damage to programs such as Medicare and Medicaid, the actions stated herein have also put patient safety and health at risk. For example, ABH's marketing materials encouraging medically unnecessary procedures and off-label applications of Dermagraft extended treatment time and exposed patients suffering from a chronic open wound to significant risk of harm, such as bone infections that could require amputation and ultimately cause death.

30.     From on or around February 15, 2007, through on or around January 16, 2014, Defendant engaged in a nationwide scheme to defraud the United States and the above-captioned Plaintiff States by knowingly submitting and/or causing to be submitted false and/or fraudulent claims; knowingly making, using, and/or causing to be made or used false statements and records material to such claims; and by retaining and/or concealing overpayments from government health insurance programs.

31.     The Federal FCA provides that any person who engages in such conduct is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the government. The FCA permits persons (known as "relators") having information regarding such conduct against the government to bring an action on behalf of the government and to share in any recovery. The complaint must be filed under seal, without service on the defendant. The complaint remains under seal while the government

10

conducts an investigation of the allegations in the complaint and determines whether to join the action. The Plaintiff States' FCAs contain comparable provisions.

32.     Pursuant to the Federal and State FCAs, Relator seeks to recover, on behalf of the United States and the states named in this Complaint, damages and civil penalties arising from Defendant's defrauding of Medicare, Medicaid, CHAMPUS/TRICARE, the Federal Employees Health Benefit Plan, and other government funded health insurance programs, as detailed below.

33.     Information about Defendant's illegal conduct is detailed further in the paragraphs below.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over this action under the False Claims Act ("FCA") causes of action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. §§ 3732(a), 3730. Additionally, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court for state-law claims that arise under the same transactions or occurrences as the action brought under 31 U.S.C. § 3730.

35.     Venue is appropriate as to Defendant in that Defendant can be found, resides, and/or has transacted business in this judicial district, and/or acts proscribed by 31 U.S.C. § 3729 have been committed by Defendant in this judicial

district.  Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a).

36.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendant can be found in, resides in, transacts business in and/or has committed the alleged acts throughout the United States.

37.     Under 31 U.S.C. § 3730(e)(4)(A) (and the comparable provision of the State FCAs), there has been no statutorily relevant public disclosure with respect to this Complaint.  Even to the extent there has been any such public disclosure, Relator is an original source as defined by the FCA in 31 U.S.C. § 3730(e)(4)(B) and in comparable provisions of the State FCAs.  Relator has made voluntary disclosures to the United States and the above-captioned Plaintiff States prior to the filing of this lawsuit pursuant to 31 U.S.C. § 3730(b)(2) and similar provisions in the State FCAs.

## THE PARTIES

38.     The real parties in interest to the FCA *Qui Tam* claims herein are the sovereign governments of the United States of America, as well as those States listed above, by virtue of the State FCAs.  Accordingly, at this time, Relator is pursuing his cause of action on behalf of the United States and the named States on

the FCA *Qui Tam* claims set forth herein pursuant to 31 U.S.C. § 3730(c)(3), and comparable provisions of the State FCAs.

39.     Relator Antonio S. Montecalvo is a citizen of the United States of America. He is a resident of Seekonk, Massachusetts, and an employee of Organogenesis, which sold Apligraf in competition with Defendant's Dermagraft product. He brings this *Qui Tam* action based upon information obtained during the period of his active employment at Organogenesis from June 2003 through the present.

40.     Defendant Shire Regenerative Medicine, Inc., f/k/a Advanced BioHealing, Inc. ("ABH") has been a wholly owned subsidiary of Shire plc since on or around June 28, 2011.[1] ABH is a corporation organized under the laws of Delaware and has its principal place of business at 11095 Torreyana Road, San Diego, California 92121. ABH conducts business throughout the United States (including in Washington, D.C.), and Shire plc's family of companies conducts business globally. Prior to Shire plc's acquisition of Advanced BioHealing, Inc. by merger on or around June 28, 2011, Advanced BioHealing, Inc. was a corporation organized under the laws of Delaware, with its principal place of business at 36 Church Lane, Westport, Connecticut 06880. Shire Regenerative Medicine, Inc. is a

---

[1] Shire Regenerative Medicine, Inc. is a wholly owned direct subsidiary of Shire US Holdings, Inc., which is a Delaware corporation and a wholly owned indirect subsidiary of Shire plc.

13

21

successor in interest to Advanced BioHealing, Inc. by operation of law. "ABH," as used herein, refers to both entities.

## FEDERAL AND STATE LAWS AND REGULATIONS

### A.   The Anti-Kickback Laws of the United States and the States

41.   The Medicare and Medicaid Patient Protection Act, also known as the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupt medical decision-making and can result in the provision of goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population.  To protect the integrity of the Federal Health Care Programs, Congress enacted a prohibition against the payment of kickbacks in any form.  The AKS was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the medicare and medicaid programs."  H.R. Rep. No. 92-231, at 90 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5093.

42.   In 1977, Congress amended the AKS to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony, with a penalty of $25,000 and/or five years in jail.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, § 241(b), (c), 86 Stat.

14

1329, 1419; 42 U.S.C. § 1320a-7b(b).  In so doing, Congress noted that the

purpose of the AKS was to combat fraud and abuse in medical settings that "cheats

taxpayers who must ultimately bear the financial burden of misuse of funds . . .

diverts from those most in need, the nation's elderly and poor, scarce program

dollars that were intended to provide vitally needed quality health services . . .

[and] erodes the financial stability of those state and local governments whose

budgets are already overextended and who must commit an ever-increasing portion

of their financial resources to fulfill the obligations of their medical assistance

programs."  H.R. Rep. No. 95-393(II), at 44 (1977), *reprinted in* 1977

U.S.C.C.A.N. 3039, 3047.

43.    In 1987, Congress again strengthened the AKS to ensure that

kickbacks masquerading as legitimate transactions did not evade its reach.  *See*

Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, 91

Stat. 1175 (1977); Medicare and Medicaid Patient and Program Protection Act of

1987, Pub. L. No. 100-93, 101 Stat. 680.

44.    In 1996, Congress expanded the AKS to reach claims involving all

"[f]ederal health care programs," defined as "any plan or program that provides

health benefits, whether directly, through insurance, or otherwise, which is funded

directly. in whole or in part, by the United States Government (other than the

health insurance program under chapter 89 of title 5, United States Code)."  Health

15

23

Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191,

§ 204(a)(7), 110 Stat. 1936, 1999-2000 (adding 42 U.S.C § 1320a-7b(f)).

45. In 2010, Congress clarified two important issues regarding the

application of the AKS. First, Congress clarified that any "claim that includes

items or services resulting from a violation of this section constitutes a false or

fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United

States Code" – *i.e.*, the FCA, 31 U.S.C § 3729 *et seq*. Patient Protection and

Affordable Care Act ("PPACA"), Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 468,

759 (2010) (adding 42 U.S.C. § 1320a-7b(g)). Second, Congress clarified that,

"[w]ith respect to violations of this section, a person need not have actual

knowledge of this section or specific intent to commit a violation of this section."

*Id.* § 6402(f)(2) (adding 42 U.S.C. § 1320a-7b(h)).

46. The AKS prohibits any person or entity from knowingly and willfully

offering to pay or paying any remuneration to another person to induce that person

to purchase, order, or recommend any good or item for which payment may be

made in whole or in part by a Federal Health Care Program, which includes any

state health program or health program funded in part by the federal government.

42 U.S.C. § 1320a-7b(b), -7b(f).

47. The statute provides, in pertinent part:

(b) Illegal remunerations

16

24

\* \* \*

>> (2)    Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>>
>>> (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>>
>>> (B)    to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

48.    In addition to criminal penalties, a violation of the AKS can also subject the perpetrator to exclusion from participation in Federal Health Care Programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)), and penalties in the amount of three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose, 42 U.S.C. § 1320a-7a(a).

49.    The AKS not only prohibits outright bribes and rebate schemes, but also prohibits any payment or other remuneration by a company to a physician or

other person which has as one of its purposes the inducement of the physician to prescribe the company's products or the inducement of the physician to influence or recommend the prescribing of the product.

50.    Remuneration includes the provision of "services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6). *See United States ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1281 (M.D. Fla. 2011) (citing *United States ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267 (D. Mass. 2010)); *see also* Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35958 (July 29, 1991) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.").

51.    Compliance with the AKS is a precondition to participation as a health care provider under Government Health Care Programs, including Medicare and the state Medicaid programs. *See, e.g., United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 312 (3d Cir. 2011) (citing 42 C.F.R. § 413.24(f)(4)(iv)).

52.    Moreover, compliance with the AKS is a precondition to payment for claims administered by physicians for which Medicare or Medicaid reimbursement is sought. Violation of the preconditions in statutes, regulations, and provider agreements for payment from or participation in government programs may form

18

the basis for a FCA claim where there is an underlying course of fraudulent

conduct. *See United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d

377 (1st Cir. 2011) (Medicare and Anti-Kickback Act); *State of New York v. Amgen*

*Inc.*, 652 F.3d 103 (1st Cir. 2011) (Medicaid and the Anti-Kickback Act); *see also*

*United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 54 (D.

Mass. 2011) (collecting cases).

53.     A Medicare claim must be for reasonable and necessary services only.

Under 42 U.S.C. § 1395y(a)(1)(A), "no payment may be made [under the

Medicare statute] for any expenses incurred for items or services . . . which . . . are

not reasonable and necessary for the diagnosis or treatment of illness or injury."

54.     Therefore, every Medicare claim is an implicit certification that the

underlying services were reasonable and necessary.  The Second Circuit has held

that, "[s]ince § 1395y(a)(1)(A) *expressly* prohibits payment if a provider fails to

comply with its terms, defendants' submission of the claim forms implicitly

certifies compliance with its provision." *United States ex rel. Mikes v. Straus*,

274 F.3d 687, 701 (2d Cir. 2001); *see also Ebeid ex rel. United States. v. Lungwitz*,

616 F.3d 993, 996 (9th Cir. 2010); *United States ex rel. Smith v. Yale Univ.*, 415 F.

Supp. 2d 58, 98 (D. Conn. 2006); *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D.

318, 335, 345-47 (D. Conn. 2004); *United States ex rel. Kneepkins v. Gambro*

*Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000); *United States ex rel.*

*Kappenman v. Compassionate Care Hospice of the Midwest, L.L.C.*, No. CIV. 09-4039-KES, 2012 WL 602315 (D.S.D. Feb. 23, 2012).

55.    Kickbacks are, by definition, not reasonable or necessary for the diagnosis or treatment of illness or injury, which is a prerequisite for payment of any claim by Medicare and other governmental health programs.

56.    Further, federal law makes clear that violation of the AKS can support False Claims Act liability. *See* 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]."); *see also United States ex rel. Wilkins*, 659 F.3d at 313 (reversing dismissal because the "amended complaint meets the implied false certification standards for liability as they alleged that appellees received payment from the federal health insurance programs despite their knowing violation of the AKS"); *United States ex rel. Hutcheson*, 647 F.3d 377; *State of New York v. Amgen Inc.*, 652 F.3d 103 (1st Cir. 2011); *United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (affirming denial of dismissal, because "[w]hen a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the Act, for its submission of those false claims.").

20

57.     Many of the named Plaintiff States also have anti-kickback laws similar to the AKS, which apply to medical providers and entities participating in their Medicaid programs. *See, e.g.*, California, Cal. Welf. & Inst. Code § 14107.2; Delaware, Del. Code. Ann. tit. 31, § 1005; Florida, Fla. Stat. Ann. § 409.920(2)(a)(5); Illinois, 305 Ill. Comp. Stat. Ann. 5/8A-3; Louisiana, La. Rev. Stat. Ann. § 46:438.2; Massachusetts, Mass. Gen. Laws Ann. ch. 118E, § 41; Michigan, Mich. Comp. Laws Ann. § 400.604; New York, N.Y. Soc. Serv. Law § 366-d; and Virginia, Va. Code Ann. § 32.1-315.

58.     Violations of the federal or state AKS laws can subject the perpetrator to liability under the Federal and State FCAs, for example, for causing the submission of false or fraudulent claims or for making a false or fraudulent statement or record material to a false or fraudulent claim. *See, e.g.*, PPACA, amending the federal AKS, 42 U.S.C. § 1320a-7b to add new subsections (g) and (h) (items or services resulting from a violation of the AKS constitute false or fraudulent claims for purposes of the Federal FCA and no actual knowledge of this section or specific intent to commit a violation of this section is required); *United States ex rel. Hutcheson*, 647 F.3d 377.

**B.      The Federal and State False Claims Acts**

59.     The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for

21

payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

60.     The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

61.     The FCA, 31 U.S.C. § 3729(a)(1)(G), provides that any person who "knowingly" makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

62.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property" which "is made to a

contractor, grantee, or other recipient" if the United States Government provides

"any portion of the money or property" which is "requested or demanded," or if the

Government "will reimburse such contractor, grantee, or other recipient for any

portion of the money or property which is requested." 31 U.S.C. § 3729(b)(2).

63.     The FCA, 31 U.S.C. § 3729(b)(1) provides that "(1) the terms

'knowing' and 'knowingly' – (A) mean that a person, with respect to information –

(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the

truth or falsity of the information; or (iii) acts in reckless disregard of the truth or

falsity of the information; and (B) require no proof of specific intent to defraud."

64.     The FCA, 31 U.S.C. § 3729(b)(4), provides that "(4) the term

'material' means having a natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property."

65.     The FCA, 31 U.S.C. § 3729(b)(3), defines an "obligation"

to pay as "an established duty, whether or not fixed, arising from an express or

implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-

based or similar relationship, from statute or regulation, or from the retention of

any overpayment." Moreover, in the health care context, such as Medicare and

Medicaid, the term "obligation" is further defined as: "Any overpayment retained

by a person after the deadline for reporting and returning the overpayment . . . is an

obligation (as defined [in the FCA])," and an overpayment must be reported "[b]y

23

the later of . . . 60 days after the date on which the overpayment was identified . . .

or the date any corresponding cost report is due, if applicable." Patient Protection

and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, § 6402(d)-(e), 124 Stat.

119, 755 (codified at 42 U.S.C. § 1128J(d)). *See also* 42 U.S.C. § 1320a-7k(d).

 66. Additionally, many states have passed False Claims Act legislation,

which in most instances closely tracks the Federal FCA. The State FCAs apply,

*inter alia*, to the state portion of Medicaid losses caused by false Medicaid claims

to the jointly federal-state funded Medicaid program and failure to report and

return any overpayments therefrom. Defendant's acts alleged herein also constitute

violations of the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*; the

Colorado Medicaid False Claims Act, Colo. Rev. Stat. 25.5-4-303.5 *et seq.*; the

Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301; the Delaware False

Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.*; the Florida False

Claims Act, Fla. Stat. § 68.081 *et seq.*; the Georgia Taxpayer Protection False

Claims Act, Ga. Code Ann. § 23-3-121 *et seq.*; the Hawaii False Claims Act, Haw.

Rev. Stat. § 661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat.

§ 175/1 *et seq.*; the Indiana False Claims and Whistleblower Protection Act, Ind.

Code § 5-11-5.5-1 *et seq.*; the Iowa False Claims Act, Iowa Code § 685.1 *et seq.*;

the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46.

438.1 *et seq.*; the Maryland False Health Claims Act, Md. Code Ann. Health-Gen.

§ 2-601 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5 *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; the New York False Claims Act, N.Y. St. Fin. Law § 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act Okla. Stat. tit. 63, § 5053 *et seq.*; the Rhode Island State False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.001 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et seq.*; the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 *et seq.*; and the District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq.* Each of the statutes listed above contains *Qui Tam* provisions governing, *inter alia*, a relator's right to claim a share of the state's recovery.

67.    Relator seeks to recover damages and civil penalties in the name of the United States of America and the named States, arising from the false or

25

fraudulent statements and claims for payment made or caused by Defendant to the United States and the above-listed States and other violations of the Federal and State FCAs.

### C.     The Federal Food, Drug, and Cosmetic Act

68.     In order to market a Class III medical device, such as Dermagraft, a premarket approval ("PMA") application for the device must be approved by the FDA under 21 U.S.C. § 360e. "Premarket approval (PMA) is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices," such as Dermagraft. FDA Website, Premarket Approval (PMA), *available at* http://www.fda.gov/medicaldevices/deviceregulationandguidance/howtomarketyourdevice/premarketsubmissions/premarketapprovalpma/default.htm (accessed Feb. 11, 2014). "PMA approval is based on a determination by FDA that the PMA contains sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s). An approved PMA is, in effect, a private license granting the applicant (or owner) permission to market the device." *Id.*

69.     "A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device." 21 C.F.R. § 814.80.

70.    A Class III device that fails to meet PMA requirements is considered to be adulterated under 21 U.S.C. § 351(f), and thus cannot be marketed.

71.    A Class III device is considered to be misbranded under 21 U.S.C. § 352(f) if, *inter alia*, its labeling does not contain "adequate directions for use." *See* 21 U.S.C. § 351(f)(1). "Adequate directions for use means directions under which the layman can use a device safely and for the purposes for which it is intended." 21 C.F.R. § 801.5. "The words intended uses . . . refer to the objective intent of the persons legally responsible for the labeling of devices." *Id.* 801.4 (describing the standard).

72.    Certain devices, such as Dermagraft, are also considered misbranded if offered for sale in any state and their "advertising is false or misleading," 21 U.S.C. § 352(q), or if advertisements or other descriptive matter does not include, *inter alia*, "a brief statement of the intended uses of the device and relevant warnings, precautions, side effects, and contraindications," 21 U.S.C. § 352(r).

73.    The Federal Food, Drug, and Cosmetic Act ("FFDCA") prohibits "[t]he introduction or delivery for introduction[, or causing the introduction or delivery for introduction,] into interstate commerce of any . . . device . . . that is adulterated or misbranded," 21 U.S.C. § 331(a); "[t]he adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce,"

27

*id.* § 331(b); and "[t]he manufacture within any Territory of any . . . device . . . that is adulterated or misbranded," *id.* § 331(g).

74.    Whether a device is FDA-approved for a particular use is a key factor in whether its use is reimbursed under Government Health Care Programs.

### D.    Co-Payment Assistance Funds

75.    ABH created an entity called Heal2gether to provide assistance to Medicare beneficiaries, which may have included transportation for them and assistance with co-payments.

76.    In the case of Medicare and Medicaid beneficiaries, provision of co-payment assistance is subject to federal law, including the AKS, which makes it a criminal offense knowingly and willfully to offer, pay, solicit, or receive any remuneration to induce or reward referrals of items or services reimbursable by a Federal Health Care Program.  For purposes of the AKS, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind.

77.    The AKS has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.  *See United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000).

78.     Claims submitted for payment by Medicare and/or Medicaid that relate to a violation of the AKS are false claims under the FCA.

79.     Longstanding HHS OIG guidance makes clear that patient assistance programs may "implicate the anti-kickback statute." OIG Advisory Opinion No. 03-03, at 4-5 (Feb. 3, 2003), at https://oig.hhs.gov/fraud/docs/advisoryopinions/2003/ao0303.pdf. Indeed, in an advisory opinion issued February 3, 2003, it explained that a patient assistance program that would have reimbursed Medicare Part B beneficiaries for cost-sharing amounts incurred in connection with particular drugs "is squarely prohibited by the [anti-kickback] statute. Simply put, the [pharmaceutical company] is paying beneficiaries who use its product. Subsidizing Medicare cost-sharing amounts can be very profitable to manufacturers. So long as the manufacturer's sales price for the product exceeds its marginal variable costs plus the cost-sharing amounts, the manufacturer makes a profit. Given that the marginal variable cost of a drug can be quite low, the profit can still be considerable despite the patient subsidy, especially for an expensive drug for a chronic condition." *Id.* at 5.

80.     It also explained that "the Proposed Arrangement would provide the Drugs with an obvious financial advantage over competing drugs in the market. Since the [pharmaceutical company] would be providing cost-sharing assistance

29

for its Drugs, rational beneficiaries would prefer treatment with the [pharmaceutical company]'s Drugs, rather than treatment with other drugs for which they must pay the cost-sharing amounts themselves." *Id.*

81.     Not to mention, the proposed patient assistance program "could result in increased costs to the Medicare program. Since beneficiaries would be insulated from their financial liability for the [pharmaceutical company]'s Drugs, there would be no incentive to use competing, equally effective products, even if they were less expensive." *Id.*

82.     Similarly, in an advisory opinion issued September 27, 2002, HHS OIG evaluated a proposed arrangement involving financial assistance by a non-profit foundation that a pharmaceutical company proposed to establish and fund in order to subsidize Medicare Part B cost-sharing amounts incurred by financially needy patients using its drug. OIG Advisory Opinion No. 02-13, at 4 (Sept. 27, 2002), at https://oig.hhs.gov/fraud/docs/advisoryopinions/2002/ao0213.pdf. Again, it explained that the proposed plan "would clearly implicate the anti-kickback statute." *Id.* Addressing "whether [HHS OIG] should permit a manufacturer of a drug or device that is covered under a Federal health care program to subsidize copayments incurred by financially needy beneficiaries for using the manufacturer's product," it advised that "such arrangements implicate the anti-kickback statute and pose a substantial risk of program and patient fraud and

abuse." *Id.* The proposed arrangement was "squarely prohibited by the statute" and "pose[d]s all the usual risks of fraud and abuse associated with kickbacks." *Id.* at 5.

## GOVERNMENT HEALTH INSURANCE PROGRAMS

83.     The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (referred to herein as "Medicare"), is a health insurance program administered by the Government of the United States that is funded by taxpayer revenue. Medicare is overseen by the United States Department of Health and Human Services ("HHS") through its Center for Medicare and Medicaid Services ("CMS").

84.     Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services, prescription drugs, and durable medical equipment to persons over sixty-five (65) years of age, and for certain others that qualify under the terms and conditions of the Medicare program.

85.     Payments made under the Medicare program include payment for certain prescription drugs used during treatment at an appropriate medical facility and otherwise, as well as certain injectable drugs.

86.     Reimbursement for Medicare claims is made by the United States through CMS, which contracts with private insurance carriers, currently referred to

31

as Medicare Administrative Contractors ("MACs"), to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the carriers act on behalf of CMS.

87.   The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (referred to herein as "Medicaid"), is a health insurance program administered by the Government of the United States and the various individual states and is funded by state and federal taxpayer revenue. Medicaid is overseen by HHS and CMS.

88.   Medicaid was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to, among others, financially needy individuals that qualify for Medicaid. The states directly pay providers, with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30.

89.   The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members. The program is administered by the Department of Defense and funded by the federal government. CHAMPUS pays for, among other items and services, prescription drugs for its beneficiaries.

32

40

90.     The federal government, through its Departments of Defense and

Veterans Affairs, maintains and operates medical facilities including hospitals, and

receives and uses federal funds to purchase prescription drugs for patients treated

at such facilities and otherwise. In addition, under the Public Health Service Act,

the Section 340B Drug Pricing Program, and the Veterans Health Care Act of 1992,

the federal government directly or indirectly provides funds to certain other federal

agencies and to state and local facilities and programs, including to non-profit

disproportionate share hospitals ("DSH"). *See generally* 38 U.S.C. § 8126.

91.     The Federal Employees Health Benefits Program provides health care

benefits for qualified federal employees and their dependents. It pays for, among

other items and services, prescription drugs for its beneficiaries.

92.     Reimbursement practices under all Government Health Care

Programs closely align with the rules and regulations governing Medicare

reimbursement. The most basic requirement for reimbursement eligibility under

Medicare, Medicaid, and other Government Health Care Programs is that the

service provided must be reasonable and medically necessary. *See*, *e.g.*, 42 U.S.C.

§ 1395y(a)(1)(A); 42 U.S.C. § 1396 *et seq.*; 42 C.F.R. §§ 410.50(a), 411.15,

411.406(a); *United States v. Rutgard*, 116 F.3d 1270, 1275 (9th Cir. 1997) (holding

that TRICARE and the Railroad Retirement Health Insurance Program plan follow

the same rules and regulations as Medicare, citing, *e.g.*, 32 C.F.R. § 199.4(a)(1)(i)).

Medical providers are not permitted to bill the government for medically

unnecessary services or procedures performed solely for the profit of the provider.

For example, the requisite level of medical necessity may not be met where a party

contends that a particular procedure was deleterious or performed solely for profit.

*Kneepkins*, 115 F. Supp. 2d at 41-42 (procedures chosen solely for defendants'

economic gain are not "medically necessary" as required by claim submission

form).  Health care providers are obligated to assure that services or items ordered

or provided to patients will be provided "economically and only when, and to the

extent, medically necessary" and "will be of a quality which meets professionally

recognized standards of health care," and "will be supported by evidence of

medical necessity and quality."  42 U.S.C. § 1320c-5(a)(1)-(3).

93.     Each Government Health Care Program requires every provider who

seeks payment from the program to promise and ensure compliance with the

provisions of the AKS and with other federal laws governing the provision of

health care services in the United States.  That agreement represents an ongoing

obligation, and the provider must notify the government of any change in

information or certifications provided.

94.     In other words, if a provider tells CMS or its agent that it provided

goods or services that (1) were in violation of the AKS, (2) were not medically

unnecessary, (3) were performed solely for the profit of the provider, and/or

(4) violated another relevant law, CMS will not pay the claim.

95.    CMS also will not pay a claim relating to reimbursement for goods or

services that were not actually provided.

96.    Physicians and hospitals enter into Provider Agreements with CMS in

order to establish their eligibility to seek reimbursement from Medicare. As part of

that agreement, without which the hospitals and physicians may not seek

reimbursement from Federal Health Care Programs, the provider must sign the

following certification:

> I agree to abide by the Medicare laws, regulations and program
> instructions that apply to [me]. The Medicare laws, regulations, and
> program instructions are available through the Medicare contractor. I
> understand that payment of a claim by Medicare is conditioned upon
> the claim and the underlying transaction complying with such laws,
> regulations, and program instructions (including, but not limited to,
> the Federal Anti-Kickback statute and the Stark law), and on the
> provider's compliance with all applicable conditions of participation
> in Medicare.

Form CMS-855A, at 48 (for institutional providers), *available at*

http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855a.pdf;

Form CMS-855I, at 25 (for physicians and non-physician practitioners), *available*

*at* http://www.cms.gov/Medicare/CMS-Forms/CMS-

Forms/Downloads/cms855i.pdf.

35

97. The "Certification Statement" that the physicians and non-physician practitioners must sign also contains the following provisions and requirements, *inter alia*, for "initial and continuous enrollment in the Medicare program," and instructs that by signing the Certification Statement, the provider "agree[s] to adhere to all of the requirements listed therein." Form CMS-855I, at 25.

98. Further, it states: "You MUST sign and date the certification statement below in order to be enrolled in the Medicare program. In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below." *Id*.

99. By signing the "Certification Statement," the provider certifies, *inter alia*, the following:

> 1. I have read the contents of this application, and the information contained herein is true, correct, and complete. If I become aware that any information in this application is not true, correct, or complete, I agree to notify the Medicare [program] in accordance with the time frames established in 42 CFR § 424.516.
>
> . . .
>
> 3. I have read and understand the Penalties for Falsifying Information . . . I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare . . . may be punished by criminal, civil, or administrative penalties including, but not limited to, the denial or revocation of Medicare billing privileges, and/or imposition of fines, civil damages, and/or imprisonment.

36

8. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Id.*

100. The certifications made by the medical provider in the Provider Agreement, which are mandatory for Medicare enrollment, expressly create a continuing duty to comply with the conditions of participation in and payment by the Medicare program. In particular:

    a. Prior to signing the Agreement, the provider is advised of the criminal, civil, and administrative penalties "for deliberately furnishing false information in this application to gain or maintain enrollment in the Medicare program." *Id.* at 23; and

    b. Among those penalties are criminal sanctions for fraud, concealment, and "any trick, scheme or device" or scheme to defraud, any false or fraudulent statement or representation or "any false writing or document," violations of the FCA, civil penalties for billing for a medical or other item or services that the provider knows or should know was not provided as claimed. *Id.* "Remedies include compensatory and punitive damages, restitution, and recovery of the amount of the unjust profit." *Id.* at 24.

37

101.   When a provider submits a claim for payment, he or she does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, including, without limitation, the Anti-Kickback Statue.

102.   In the case of Medicaid, each state's Medicaid Program's applicable certifications also incorporate relevant state law.

## THE RELATOR

103.   Relator Antonio S. Montecalvo graduated from the University of Rhode Island in 1988 with a Bachelor of Science.  He majored in Accounting and minored in Management.  He is a Certified Public Accountant.

104.   From March 1996 to December 1999, Relator worked as a Senior Contract Specialist at United Healthcare of New England, Inc., in Warwick, Rhode Island ("United").  He had contract management responsibilities for community hospitals and other ancillary and physician providers.  During that time, Relator managed provider relations issues and customer service issues, developed a reimbursement methodology for durable medical equipment vendors and billing protocols, and negotiated two hospital contracts within Rhode Island that reduced overall medical costs.

105.   In January 2000, he became a Senior Financial Analyst at United.  His responsibilities included preparing statements of revenue and medical costs for

38

health insurance products and preparing regulatory filings. While at United, he prepared an analysis of the statement of revenue and medical costs for Medicare products. He also prepared an analysis of United's commercial fee schedule to target reimbursement increases to physicians within specific geographic locations.

106.   In December 1999, Relator left United and joined Innovative Clinical Solutions, Ltd., which was later acquired by Comprehensive Neuroscience, Inc. ("Innovative"), as Director of Accounting. While at Innovative, Relator directed the company's treasury function, accounts payable, and accounts receivable.

107.   He left Innovative in June 2003 to join Organogenesis, in Canton, Massachusetts, where he became, and remains, Director of Customer Support Services. In that capacity, he has responsibility for directing distribution (including materials management and product shipment). He also has responsibility relating to the customer support center, which includes customer service call center and the reimbursement call center. In addition, Relator directs the strategic health policy plans for Apligraf, as well as other products. In that role, he interacts with high-ranking policy members at the Centers for Medicare and Medicaid Services, as well as Medical Directors at MACs. As a part of his responsibilities, he also travels with members of the sales team to assess the effectiveness of services Organogenesis provides, assess customer expectations, and guide the evolution of customer support services.

108.   Relator learned of ABH's fraudulent scheme described herein through his employment at Organogenesis.

109.   By virtue of his employment at a company that competed with ABH, Relator obtained emails and documents demonstrating ABH's fraudulent conduct described herein, but lacked access to documents that detail the specific false or fraudulent claims ABH submitted or caused medical providers to submit.

## PRODUCTS MANUFACTURED
## AND SOLD BY DEFENDANT

110.   Defendant marketed and sold Dermagraft from on or around February 15, 2007, through on or around January 16, 2014.  Dermagraft was developed by Advanced Tissue Sciences Inc. ("ATS"), which entered into a joint venture with Smith & Nephew in 1996 to commercialize Dermagraft.  When ATS filed for bankruptcy in 2002, Smith & Nephew acquired the rights to Dermagraft.  ABH purchased Dermagraft from Smith & Nephew in or around June 2006.  Shire plc acquired Advanced BioHealing, Inc. in 2011 and changed its name to Shire

Regenerative Medicine, Inc. effective July 18, 2012.[2]  On or around January 16, 2014, Organogenesis agreed to acquire the Dermagraft assets from ABH.[3]

111.    Dermagraft is a cryopreserved single-layer dermal substitute manufactured from donated human skin tissue.  It is a Class III medical device that is FDA-approved to treat full-thickness diabetic foot ulcers greater than six weeks duration, which extend through the dermis, but without tendon, muscle, joint capsule, or bone exposure.

112.    The FDA approved Dermagraft for use in the United States on or about September 28, 2001 – before ABH acquired the rights to Dermagraft.  In its approval letter, the FDA stated that Dermagraft was "indicated for use in the treatment of full-thickness diabetic foot ulcers greater than six weeks duration which extend through the dermis, but without tendon, muscle, joint capsule, or bone exposure."  *See* Ltr. from Celia M. Witten, PhD, M.D., Dept. of Health and Human Services to Mr. Ronald S. Warren, Advanced Tissue Services, at 1 (Sept. 28, 2001) ("FDA Approval Ltr."), *available at*

―――――――――――――

[2] Shire acquired Advanced BioHealing, Inc. pursuant to a merger agreement. Pursuant to that agreement, any liability incurred by Advanced BioHealing, Inc. succeeded to Defendant.

[3] Organogenesis did not assume the legacy liabilities relating to the Dermagraft business incurred prior to the date of the merger that are the subject of this Complaint.

http://www.accessdata.fda.gov/cdrh_docs/pdf/p000036a.pdf (accessed Jan. 30,

2014); *see also* FDA Web site, *Medical Devices – Dermagraft-P000036, available*

*at*

http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceAppro

valsandClearances/Recently-ApprovedDevices/ucm085085.htm (accessed Jan. 30,

2014).  Its sale, distribution, and use were "restricted to prescription use in

accordance with 21 C.F.R. § 801.109 within the meaning of section 520(e) of the

Federal Food, Drug, and Cosmetic Act (the act) under the authority of section

515(d)(1)(B)(ii) of the act.  FDA has also determined that, to ensure the safe and

effective use of the device, the device is further restricted within the meaning of

section 520(e) under the authority of section 515(d)(1)(B)(ii) insofar as the sale,

distribution, and use must not violate sections 502(q) and (r) of the act."  *See* FDA

Approval Ltr. at 1.  The FDA also imposed requirements on the contents of post-

approval reports.  *See id.* at 1-2.

113.    During the relevant period, ABH supplied Dermagraft to medical

providers in pieces that were 37.5 square centimeters.  Medical providers who

purchased Dermagraft during the relevant period were required to bill in round

numbers.  Accordingly, they billed Government Health Care Programs, such as

Medicare and Medicaid, for 38 square centimeters for each 37.5 square centimeters

of product they applied to patients.

## CODING SYSTEMS RELEVANT TO
## ABH'S FRAUDULENT CONDUCT

114.   In order to seek reimbursement for the Dermagraft product administered to patients and medical procedures provided relating to the administration of Dermagraft to patients, medical providers were, during the relevant period, and remain required to use the Healthcare Common Procedure Coding System ("HCPCS") and the International Classification of Diseases ("ICD").

115.   The HCPCS is a standardized coding system for describing the specific items and services provided in the delivery of healthcare.  HCPCS coding is necessary for Medicare, Medicaid, and other Government Health Care Programs to ensure that insurance claims are processed in an orderly and consistent manner.

116.   The HCPCS is divided into two principal subsystems – Level I and Level II.  Level I of the HCPCS is comprised of Current Procedural Terminology ("CPT Codes" or "CPT"), a numeric coding system maintained by the American Medical Association ("AMA").  Level I is a uniform coding system that consists of descriptive terms and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals.  These health care professionals use the CPT to identify services and procedures for which they bill public or private health insurance programs.  The CPT Codes are republished and updated annually by the AMA.  Level II of the

43

HCPCS is a standardized coding system that is used primarily to identify products, supplies, and services not included in the CPT Codes, such as ambulance services and durable medical equipment, prosthetics, orthotics, and supplies. Because Medicare and other insurers cover a variety of services, supplies, and equipment that are not identified by CPT Codes, the Level II HCPCS Codes were established for submitting claims for these items. Level II codes are also referred to as alpha-numeric codes because they consist of a single alphabetical letter followed by four numeric digits, while CPT Codes are identified using five numeric digits.

117.   ICD is a standard diagnostic tool for epidemiology, health management, and clinical purposes that is published by the World Health Organization. It is used to monitor the incidence and prevalence of diseases and other health programs through classifying diseases and other health problems recorded on various types of health and vital records, such as death certificates and health records. In the United States, HHS published, *inter alia*, the ICD, 9th Revision, Clinical Modification ("ICD-9-CM") based on the ICD. The ICD-9-CM is the official system of assigning codes to diagnoses and procedures associated with hospital utilization in the United States. ICD-9-CM codes are three- to five-digit numerical codes that describe a diagnosis or medical procedure. ICD-9-CM is, and during the relevant period was, the standard for diagnostic coding and inpatient hospital coding in the United States. Covered entities required to use the

44

ICD-9-CM code set include health plans, health care clearinghouses, and health care providers who transmit any electronic health information in connection with a transaction for which a standard has been adopted by HHS.

118.   For simplicity, HCPCS Codes and CPT Codes are hereinafter referred to as "Codes."

119.   The following Codes are relevant to ABH's unlawful scheme.

a.   During the relevant period, Code 707.14 (an ICD-9-CM code) was a billable medical code that corresponded to a diagnosis regarding the plantar surface of the midfoot.  In relevant part, it was the appropriate code to use when a medical provider treated a disease of, injury to, symptom regarding, or condition of ulcers of the heel and midfoot.

b.   During the relevant period, Code 707.15 (also an ICD-9-CM code) was a billable medical code that corresponded to a diagnosis regarding the toes.  In relevant part, it was the appropriate code to use when a medical provider treated a disease of, injury to, symptom regarding, or condition of ulcers of the toes.

c.   During the relevant period, Codes 11040 through 11044 (CPT Codes, hereinafter referred to as the "Debridement Codes") were used to describe debridement of the skin for treatment of skin

45

ulcers, circumscribed dermal infections, conditions affecting continuous deeper structures, and debridement of ground-in dirt from road abrasions. Debridement is the surgical removal of lacerated, devitalized, or contaminated tissue. The purpose of debridement is to remove and disinfect lacerated, devitalized, or contaminated tissue. Codes 11040 through 11044 describe the levels of tissue debridement of independent skin or tissue structures. As a matter of medical procedure, if debridement was medically necessary, medical providers typically conducted, and thus could seek reimbursement for, debridement of tissue before Dermagraft was administered to a patient. But debridement was not routinely medically necessary, and thus medical providers should not have routinely conducted or routinely billed for debridement, on the date a medical provider administered Dermagraft. The codes corresponding to application of Dermagraft (described below), which are billed on each date a medical provider administers Dermagraft to a patient, include simple debridement of granulation tissue or recent avulsion.

d. During the relevant period, Codes 97597, 97598, 97602, 97605, and 97606 (CPT Codes, hereinafter referred to as the "Active

46

Wound Care Management Codes") corresponded to active wound care management, which involved selective debridement techniques performed to remove devitalized and/or necrotic tissue and promote healing. Active wound care management was not medically necessary for all patients to whom medical providers administered Dermagraft. As a matter of medical procedure, if active wound care management was medically necessary, medical providers typically conducted, and thus could seek reimbursement for, active wound care management after debridement and before Dermagraft was administered to a patient. But active wound care management was not routinely medically necessary, and thus medical providers should not have routinely billed for active wound care management, on the date a medical provider administered Dermagraft or on the date a medical provider conducted debridement. The codes corresponding to application of Dermagraft (described below), which are billed on each date a medical provider administers Dermagraft to a patient, include simple debridement of granulation tissue or recent avulsion.

e. Codes 15000, 15001, 15004, and 15005 (CPT Codes, hereinafter referred to as the "Site Preparation Codes") corresponded to site

47

preparation, which includes, among other things, creation of a

recipient site for the application of a skin substitute.  Prior to 2007,

Code 15000 corresponded to the first 100 square centimeters of

site preparation anywhere on the body, and Code 15001

corresponded to every additional 100 square centimeters of site

preparation anywhere on the body.  Beginning in 2007, and

through the relevant period, 15004 corresponded to the first 100

square centimeters of site preparation on the feet, hands, and face,

and Code 15005 corresponded to every additional 100 square

centimeters of site preparation on the feet, hands, and face.  As a

matter of medical procedure, it may have been medically necessary

for medical providers to conduct, and therefore seek

reimbursement for, site preparation to create a recipient site for the

application of a skin substitute on the first date a medical provider

administered Dermagraft to a patient.  But site preparation on the

date of the first application was not routinely medically necessary

because the codes corresponding to application of Dermagraft

(described below) included simple debridement of granulation

tissue or recent avulsion, which was often all that was medically

necessary on the date of application.  Accordingly, if a medical

provider routinely billed Government Health Care Programs for
site preparation in addition to the codes corresponding to
application of Dermagraft, that would constitute fraudulent double-
billing and thus would involve submitting a false or fraudulent
claim.

f.  From 2006 through 2008, Code J7342 corresponded to the pieces
of Dermagraft a medical provider administered to a patient.  In
2009, the Code was changed to Q4106.  Since January 1, 2009,
Code Q4106 has corresponded to the Dermagraft pieces a medical
provider administered to a patient.  (Codes J7342 and Q4106 are
hereinafter referred to as the "Product Code.")  During the relevant
period, it was appropriate to bill the Product Code on each date a
medical provider administered Dermagraft to a patient.

g.  From 2006 through 2011, Codes 15365 and 15365 corresponded to
the medical procedure physicians conducted to administer
Dermagraft to a patient.  The codes were changed in 2012.  From
2012 to the present, the appropriate Codes have been 15275
through 15278.  (Codes 15365, 15366, and 15275 through 15278
are hereinafter referred to as the "Application Codes.")  When a
medical provider administered Dermagraft to a patient between

49

2006 and 2011, 15365 corresponded to the procedure of

administering Dermagraft to the first 100 square centimeters of the

wound, and 15366 corresponded to the procedure of administering

Dermagraft to each additional 100 square centimeters of the

wound. From 2012 through the present, Codes 15275 and 15276

have corresponded to administering Dermagraft to wounds that

were less than 100 square centimeters, while Codes 15277 and

15278 have corresponded to administering Dermagraft to wounds

that were larger than 100 square centimeters. When administering

Dermagraft to a wound that was less than 100 square centimeters,

Code 15275 corresponded to the procedure of administering

Dermagraft to the first 25 square centimeters of the wound, and

Code 15276 corresponded to the procedure of administering

Dermagraft to each additional 25 square centimeters of the wound.

When applying Dermagraft to a wound that was larger than 100

square centimeters, Code 15277 corresponded to the procedure of

administering Dermagraft to the first 100 square centimeters of the

wound, and Code 15278 corresponded to the procedure of

administering Dermagraft to each additional 100 square

centimeters of the wound. As explained more fully below, until

50

2012, medical providers could bill, and receive reimbursement for, the Application Codes for only the first application of Dermagraft to a patient every 90 days.  Moreover, during the entire relevant period, because the Application Codes included minor debridement of granulation tissue or recent avulsion, it was improper or fraudulent to routinely bill a Debridement Code, an Active Wound Care Management Code, or a Site Preparation Code in addition to an Application Code for a given patient visit.  Doing so would constitute fraudulent or false double-billing and would involve submitting a fraudulent or false claim.

120.   At all times relevant to this Complaint, Dermagraft was FDA-approved for up to 8 applications in 12 weeks, as long as the wound demonstrated satisfactory and reasonable healing.  After 8 applications of Dermagraft or 12 weeks since the first application of Dermagraft, further applications of Dermagraft were not in accordance with Dermagraft's FDA approval.  This means that a medical provider routinely billing for more than eight applications would be fraudulently or falsely seeking reimbursement for off-label use.  This also means that a medical provider routinely billing for applications of Dermagraft when the wound was not demonstrating satisfactory and reasonable healing also would be

medically unnecessary and thus fraudulently or falsely seeking reimbursement for off-label use.

121.   From 2006 through 2011, Dermagraft had a 90-day global period of service, meaning that the value of the payment calculated for the Application Codes included all procedures involving the application of Dermagraft for the 90 days following the date of the first application.  Accordingly, if a medical provider was reimbursed for the first application of Dermagraft because it billed an Application Code for that date, the payment the medical provider would receive included payment for the first application of Dermagraft, as well as all subsequent applications of Dermagraft for the next 90 days.

122.   From on or around 2006 through 2011, ABH encouraged medical providers to use Modifier 58 in order to circumvent the 90-day global period of service.  According to CPT, Modifier 58 is, and was during the relevant period, a coding modifier used to report a staged procedure planned prospectively at the time of the original procedure; when the staged procedure is more extensive than the original procedure; or when therapy is required following a diagnostic surgical procedure.  Subsequent applications of Dermagraft are less extensive than the initial application, because each application must demonstrate satisfactory and reasonable wound healing for a subsequent application to be appropriate. Dermagraft application also is not a diagnostic surgical procedure that requires

52

therapy afterwards. When a medical provider administering Dermagraft to patients used Modifier 58, it could circumvent the 90-day global period of service and receive payments for each application of Dermagraft, instead of receiving one payment for Application Codes every 90 days. This conduct is described in more depth below.

123.   Beginning in 2012, the CMS changed the compensation scheme for medical providers administering Dermagraft. First, it changed the Application Codes relating to Dermagraft to a 0-day global period of service, meaning that the value of the payment calculated for the Application Codes applied to each application of Dermagraft. Second, it reduced the price it paid for each application. Accordingly, beginning in 2012, medical providers could be reimbursed for each application of Dermagraft. Instead of receiving one larger lump sum for all applications of Dermagraft to a given patient in a 90-day period, medical providers received a smaller sum for each application of Dermagraft.

## CODING FORMS SUBMITTED TO
## GOVERNMENT HEALTH CARE PROGRAMS

124.   In order to receive reimbursement from Government Health Care Programs, medical providers submitted forms to Government Health Care Programs or their agents, such as MACs, that contained Codes corresponding to the medical procedures and products for which the provider sought reimbursement.

53

125.    Medical providers submitted forms to Government Health Care Programs or their agents in paper – *e.g.*, a UB-04 form (also known as a CMS-1450 form; for hospitals) or a CMS-1500 form (for physicians) – or electronically – *e.g.*, an 837P form submitted via the Electronic Data Interface ("EDI").

126.    During the relevant period, medical providers used these forms, earlier iterations of these forms, or forms similar to these to make false or fraudulent claims for reimbursement for Dermagraft and medical procedures relating to administering Dermagraft.

## ABH'S NATIONAL FRAUD SCHEME
## TO INDUCE SALES OF DERMAGRAFT

127.    Defendant knowingly and intentionally engaged in a multifaceted fraudulent scheme to defraud Government Health Care Programs, including Medicare and Medicaid.  ABH's scheme, in complete disregard for federal and state law, involved offering illegal kickbacks to medical providers, marketing Dermagraft for off-label use, unlawful inducement to purchase Dermagraft based on representations about its profitability, misuse of Codes submitted to Government Health Care Programs in order to receive improper payments, and deliberately inflating Dermagraft's ASP.

128.    ABH's fraudulent scheme encouraged and induced medically unnecessary physician services nationwide, which increased the burden on patients and forced them to travel to physicians' offices or facilities to have procedures

54

performed. It also exposed patients suffering from a chronic open wound, such as a diabetic foot ulcer, to harm, including bone infections that could require amputation and ultimately cause death. Patients were forced to undergo medically unnecessary procedures and endure any requisite healing time, and they were also forced to pay any required co-pay or deductible for each visit.

129. The scheme sought to induce sales of Dermagraft and take market share from competitor products such as Apligraf.

## A. ABH Provided Kickbacks to Medical Providers To Induce Purchases of Dermagraft

130. One aspect of ABH's scheme involved providing illegal kickbacks to medical providers throughout the United States in order to induce them to purchase and administer Dermagraft. Through its provision of kickbacks, ABH knowingly and deliberately caused the submission of false claims and violated the AKS.

131. Without regard for state or federal law, Defendant developed a marketing strategy for Dermagraft founded in part on illegal kickbacks. Below are numerous examples of kickbacks ABH provided to medical providers during the relevant period to induce them to purchase Dermagraft.

> a. ABH's sales staff received excessive expense budgets, of
> approximately $7,000 to $8,000 per month, which they were
> required to use each month. The apparent purpose of these
> expense budgets for a company that had between approximately 50

55

and 130 sales personnel during the relevant period was to
encourage them to provide incentives to physicians to use
Dermagraft through the provision of illegal kickbacks.

b. On or around June 10, 2009, ABH had an arrangement with a
clinical manager providing money "per piece [of Dermagraft]
used," which led to off-label use.  On numerous occasions, ABH
sales representatives used their expense budgets to give medical
providers approximately $100 in cash per piece of Dermagraft they
ordered from ABH.

c. ABH representatives also used their budgets to compensate
physicians illegally for speaking engagements and/or for sham
research at rates that far exceed fair market value.  For example,
ABH offered a "Physician Honorarium of $200" to medical care
providers who attended a Dermagraft "Advisory Panel Dinner
Discussion" called "The Reintroduction of Dermagraft And an
Update on Reimbursement" on April 17, 2008, at Joe Fazio's,
located at 1008 Bullitt Street, Charleston, West Virginia 25301.
The ABH flier falsely stated that the honorarium was for
"involvement in the Interactive Feedback Presentation."  ABH

56

made similar offers at the annual Symposium on Advanced Wound
Care.

d. ABH representatives gave gifts, such as computer printers,
cameras, physician coats, gift certificates and gift cards to
restaurants, meals, and other food products to wound care clinics
across the country in order to induce these potential customers to
use Dermagraft. Indeed, ABH representatives have given
physicians tickets to major sporting events, including the 2008
NBA Finals, and concerts, including a U2 concert. On or around
June 10, 2009, ABH gave Tampa Bay Rays tickets to the entire
staff at a wound care clinic and it offered podiatrists courtside
Orlando Magic tickets to attend a dinner. Moreover, ABH
frequently provided its clients free meals at their wound care
centers for no apparent reason other than to induce sales of
Dermagraft. These meals were not connected to any in-service
educational program, and they were provided at times when no
ABH staff members were on site.

e. On or around July 14, 2008, ABH sent a package of filet mignon
and filet of prime rib from Omaha Steaks to the Program Director
of a wound care center in an Oklahoma hospital, with a note

57

stating, "Thanks for your support of Dermagraft!" ABH sent

steaks on numerous occasions.

f.  ABH representatives offered physicians free walkers, including in

or around Southern California, on or around January 30, 2008.

g.  ABH sponsored a bowling party at Lucky Strike Bowling

Complex, an upscale bowling alley in Los Angeles, California,

located at 6801 Hollywood Boulevard from 8:00 p.m. to 11:00

p.m. on March 19, 2009, during the March 2009 Diabetic Global

Foot Conference. A marketing document for the event stated,

"Bowling, light snacks, drinks and a Dermagraft Wet lab will be

provided courtesy of Advanced BioHealing." It provided contact

information for Justin Gardner (858-754-3721;

jgardner@advancedbiohealing.com) to answer questions.

h.  Moreover, ABH has given away prizes, such as global positioning

system units, at various state podiatric medical association

meetings.

i.  ABH improperly guaranteed coverage by Government Health Care

Programs, such as Medicare and Medicaid, for procedures relating

to Dermagraft and provided risk-free trials of Dermagraft. This

had the effect of providing Dermagraft for free when medical

58

providers did not receive payment from Government Health Care
Programs. For example, on or around September 17, 2007, ABH
forgave medical providers' obligation to pay for Dermagraft if they
were not reimbursed by Government Health Care Programs. In or
around October 2007, ABH representative Dawn Lindner told
Tina, who worked for Drs. Copeland, Rizzo, and Ash, at 4260
Glendale-Milford Road, Blue Ash, OH 45242, that if Tina's office
was denied reimbursement for Application Codes corresponding to
the second through eighth applications of Dermagraft when her
office improperly submitted Modifier 58s, ABH would pay each
individual doctor $100 for each application of Dermagraft for
which Modifier 58 was denied. On information and belief, Dawn
provided this information to the doctors and the doctors told Dawn
to tell Tina, who did the doctors' paperwork. On information and
belief, Tina called Dawn on or around October 2007 to inform
Dawn that claims were being denied and to inquire about payment
from ABH. On or around February 14, 2008, an ABH sales
representative told a medical provider that it would not need to pay
for Dermagraft until the office was fully reimbursed. On or around
February 25, 2008, Dr. Mark Johnson, a podiatrist from West

59

67

Plains, Missouri, who was "skeptical and wanting to adhere to guidelines," notified Dr. Paul Kesselman, a paid consultant to ABH, by email that he "was informed by a rep that Advanced Biohealing now precertifies the application code, CPT 15365 . . . and the corresponding supply code, J7342 . . . for 8 total applications with Medicare/secondary insurances; and does not require payment for the Dermagraft until our office is paid by insurance." Instead of explaining that guaranteeing reimbursement is fraudulent or illegal, Dr. Kesselman did almost exactly the opposite. He responded by stating that "Medicare does not pre-certify services, however, Advanced BioHealing maintains a reimbursement hotline. A team of trained customer care advisors and several health economic experts can confirm the patient's coverage, and provide an up-to-the minute interpretation of your Medicare carrier's local coverage determination (LCD). I would advise you to contact Advanced Bio Healing at 1 877-Dermagraft." Also, on or around September 2010, a program director from a high-volume wound center informed an Organogenesis employee that the center's ABH representative committed to her that "they will guarantee coverage and if there is a loss of revenue or for any

60

reason they don't receive reimbursement to cover their cost, they will handle with free samples and/or credits to make up the difference." On or around February 15, 2010, Jennifer Linsky sent a draft marketing email to ABH staff members Brian Vinca and Rick Martin stating that one reason "[m]ost other Wound Care Centers have used Dermagraft [was] reimbursement with weekly applications . . . [and] most importantly the value in having a company that will ensure your patients have the proper insurance verification completed prior to ordering the grafts. . . . No surprises on reimbursement and cost to your patients or your staff. . . . All of this costs your center and patient nothing! Advanced Biohealing incurs the cost with no obligations and does so for all patients interested in Dermagraft." Relator also obtained information on January 30, 2008, that ABH was guaranteeing reimbursement in or around Southern California. On or around February 4, 2012, ABH was guaranteeing coverage for any Dermagraft product that they told medical providers would be covered – *i.e.*, by providing Dermagraft for free if it was not covered. On information and belief, the program director at St. Luke's Hospital responded well to ABH's guarantee. Finally,

61

Relator also learned that ABH sales representatives were calling physicians' home offices to ask whether the physician had used the Dermagraft product purchased and, if not, providing the product for free.

j.  Similarly, ABH allowed customers to return unused Dermagraft at no charge. For example, in Jennifer Linsky's February 15, 2010, email, she wrote, "if a patient misses an appointment or if they get an infection and Dermagraft cannot be used, then we can simply send it back (free of charge) or hold it in a freezer (which can be provided at no charge if requested). Advanced Biohealing does not charge any of its customers for next day shipping or return shipments, nor do we charge any of those ridiculous restocking fees. If you don't use the product, no charge, simply have your rep return it. . . . I will also supply additional items needed for each case when necessary (i.e. boots, silver, wound veil, Microcyn spray, etc)." And on or around June 10, 2009, ABH was forgiving medical providers' obligations to pay for Dermagraft units ordered after Government Health Care Programs declined to reimburse medical providers for them.

k. On or around October 12, 2007, ABH was writing off patient co-pays. As a result, physicians asked Organogenesis why it could not provide similar write-offs.

l. ABH has also treated physicians to trips that had limited or no connection to Dermagraft or any educational function. For example, ABH periodically provided physicians fishing trips to Alaska and golf trips to Pebble Beach, California. In addition, existing ABH customer physicians were also given all-expenses-paid trips to La Jolla, California, veiled as a visit to ABH's facilities. ABH flew physicians and their spouses to La Jolla on a Thursday evening; physicians spent Friday morning at ABH's facilities listening to a one-hour presentation about Dermagraft; and they spent Friday afternoon playing golf on the Torrey Pines golf course. ABH paid for the physicians' rooms through the remainder of the weekend and physicians submitted meal receipts to ABH at the conclusion of their trip. The trips to La Jolla were provided to program directors on or around September 28, 2010, as well as on numerous other occasions.

m. ABH paid the entire cost of marketing campaigns that co-promoted Dermagraft with a hospital, physician, or wound care center. For

63

example, ABH co-promoted Dermagraft with Advocate Good

Samaritan Hospital Wound Care Center, located at 3815 Highland

Avenue, Downers Grove, Illinois 60515.

n. ABH financially sponsored the holiday party of the only outpatient

wound center in a major United States city.

132.  In addition to the illegal kickbacks described above, ABH created an

entity called Heal2gether to provide assistance to Medicare beneficiaries, which

may have included transportation for them and assistance with co-payments.

133.  Heal2gether's offices are located at ABH's offices, and Heal2gether is

controlled by ABH.  For example, Heal2gether's LinkedIn page describes itself as

a "Program at Shire Regenerative Medicine"; lists its location as the "Greater San

Diego Area," where ABH is located; explains that Heal2gether is "a community

health education program supported by Shire Regenerative Medicine"; and

indicates under "Experience" that it has been affiliated with "Advanced

BioHealing" since August 2009.  *See* Heal2gether's LinkedIn Page, *available at*

http://www.linkedin.com/pub/heal2gether-awareness-program/24/802/65b (last

visited Jan. 30, 2014).

134.  Heal2gether is believed to have assisted certain patients with medical

costs, including by paying Medicare beneficiaries' co-pays.  Yet it only paid co-

pays associated with Dermagraft; it did not reimburse for other skin substitute

products, such as Apligraf.  On information and belief, Heal2gether pays claims for both Medicare and Medicaid patients.

135.   Heal2gether is also believed to have assisted with transportation for its patients, helping them get from their home to their medical provider to receive applications of Dermagraft and helping them return home after treatment.

136.   ABH's kickbacks were unrelated to Dermagraft's efficacy in treating chronic wounds, and they are not subject to any safe harbor or exception to potential and/or actual referral sources.

137.   Most, if not all, Dermagraft purchases made by medical providers between on or around February 15, 2007, and on or around January 16, 2014, were tainted by an illegal kickback from Defendant that rendered any related claim false or fraudulent.

## B.   ABH's Improper Marketing Encouraged Off-Label Use of Dermagraft

138.   As part of ABH's marketing of Dermagraft and its scheme to defraud Government Health Care Programs, such as Medicare and Medicaid, it encouraged medical providers to use Dermagraft for off-label and unapproved purposes.

139.   During the relevant period, the FDA-approved, on-label use of Dermagraft was for full-thickness diabetic foot ulcers greater than six weeks duration, which extended through the dermis, but without tendon, muscle, joint

capsule, or bone exposure. During this period, Dermagraft was FDA-approved for up to 8 applications in 12 weeks, as long as the wound was healing.

140. This limited approval of Dermagraft contrasts with the uses for which ABH's sales staff promoted the product.

141. ABH's sales staff promoted Dermagraft not only to treat diabetic foot ulcers in accordance with its FDA-approved labeling, but also to treat burns; ulcers located on areas other than the foot, such as the calf and ankle; and to treat venous leg ulcers, despite the fact that Dermagraft failed its phase three pivotal trial designed to assess the product's safety and efficacy in the promotion of healing venous leg ulcers in August 2011. Specifically, Dermagraft failed to meet the end point mutually agreed upon with the FDA and EMA – complete healing (100% re-epithelialization, with no presence of scab or drainage) of venous leg ulcers by 16 weeks and a minimum absolute level of superiority over compression therapy.

142. For example, ABH gave medical providers a "Dermagraft Checklist" ("Checklist") stating that Dermagraft may be used for "Ulcer of the Lower Limb, calf or below," such as the ankle, which are ulcer locations for which Dermagraft was not FDA-approved. The Checklist did not mention Dermagraft's FDA-approved indications or that Medicare or Medicaid would cover Dermagraft for use in accord with its FDA-approved indications only. By providing the Checklist,

66

ABH intended to misconstrue the applicable Medicare and Medicaid coverage
policies in order to mislead physicians into submitting false or fraudulent claims.

143. ABH also encouraged improper, off-label use of Dermagraft by
systematically misrepresenting the terms of Local Coverage Determinations
("LCDs") issued by MACs – such as TrailBlazer Health Enterprises, LLC
("TrailBlazer") and National Government Services, Inc. ("NGS") – that
administered and paid claims on behalf of CMS. Among other things, these MACs
issue LCDs to enable health care providers to determine whether medical devices
and treatments are covered by Government Health Care Programs, such as
Medicare or Medicaid. Companies marketing medical products typically provide a
summary of the relevant LCDs concerning their product to help health care
providers evaluate whether and how to use the product. Because LCDs are
voluminous and frequently updated, many busy doctors rely on these summaries
when treating patients.

144. ABH exploited this practice to encourage improper, off-label use of
Dermagraft by disseminating marketing materials containing misleading and
incomplete summaries of LCDs relating to Dermagraft. These materials created
the false impression that Medicare and Medicaid would reimburse off-label use of
Dermagraft to treat ulcers on patients' legs, rather than on their feet only. ABH's
sales staff knew or intended that physicians would rely on these materials to use

67

Dermagraft for treatments not approved by the FDA and that physicians would submit false or fraudulent claims to Government Health Care Programs, such as Medicare and Medicaid, based on such treatment.

145. For example, in a Dermagraft marketing document dated June 21, 2008, that summarized TrailBlazer's LCD, ABH materially misrepresented the coverage for Dermagraft. On page two, ABH encouraged medical providers to use ABH for off-label purposes by listing Codes 707.10 ("Unspecified ulcer of the lower limb"), 707.11 ("Ulcer of thigh"), 707.12 ("Ulcer of calf"), 707.13 ("Ulcer of ankle"), and 707.19 ("Ulcer of other part of lower limb") – all of which are above the foot, and thus for all of which Dermagraft was not FDA-approved. ABH implied that Dermagraft was approved for such off-label uses and that medical providers should submit claims for coverage to Government Health Care Programs, such as Medicare and Medicaid, when they applied Dermagraft in those unapproved, off-label ways.

146. Moreover, in a March 25, 2008, email, Carol Gray, an ABH representative, announced that NGS and TrailBlazer recently revised their LCDs to "include[] treatment of diabetic ulcers on the calf, ankle, heel and midfoot, and other part of the foot (toes) with Dermagraft." She then listed the diagnosis codes indicating that Dermagraft was approved for use above the feet, including off-label Codes 707.12 ("Ulcer of calf") and 707.13 ("Ulcer of ankle"). Her LCD summary

68

76

failed to mention that "National Government Services will consider the use of
Class III products eligible for coverage when used in keeping with the FDA's
approved indications for those products," notwithstanding the fact that the NGS
LCD stated as much in its first section.  Also, although her LCD summary
provided indications and listed coverage limits, it omitted that the product was not
covered for uses other than as indicated by CMS or the FDA.  It also neglected to
mention that Dermagraft would be considered medically necessary "[o]nly for
ulcers located on the foot or toes," which was also included in the NGS LCD.
Finally, Ms. Gray's email inaccurately stated that the "[p]atient profile for
Dermagraft" included "Diabetic ulcers of the calf, ankle, heel and midfoot, and
other part of the foot (toes) that extend through dermis, have been there for 6
weeks or longer, are greater than 1sq cm, and have a palpable peripheral pulls (OR
ABI greater than .65)."

147.  On or around May 23, 2008, ABH promoted to a physician the
application of Dermagraft to any ulcer below the knee, as long as the patient was
diabetic.

148.  On or around the same time, a Dermagraft representative working in
or around California said that ABH had found a loophole in the NGS LCD that
allowed them to promote the use of Dermagraft on calf ulcers as long as the patient
was diabetic.

149.   On or around August 21, 2008, ABH promoted Dermagraft for use on any ulcer in a diabetic patient that was on the thigh or below. On information and belief, physicians bought into ABH's promotion.

150.   In addition, and as explained in more detail below, routinely utilizing Modifier 58 in connection with Dermagraft, which ABH encouraged, constituted off-label use. Modifier 58 is typically appropriate for staged procedures in which the second stage of the procedure is more complicated than the first. Additional applications of Dermagraft, however, were appropriate only as long as the wound was healing. If the wound was not healing, additional applications of Dermagraft would be off-label.

151.   Moreover, Modifier 58 is typically appropriate for staged procedures in which the various stages of the procedure are known at the time of the first procedure. In the case of Dermagraft, however, medical providers generally did not know how a patient would react to any given application of Dermagraft. Accordingly, they typically did not know whether future Dermagraft applications would be medically necessary.

152.   As part of its scheme to promote Dermagraft for off-label use, ABH also encouraged more than eight applications of Dermagraft to a given wound, and it encouraged using Dermagraft regardless of whether the wound was healing as a

70

result of the treatments. Both uses of Dermagraft were medically unnecessary and off-label.

153.   ABH paid its sales representatives commission based, at least in part, on the number of Dermagraft pieces ABH shipped to the representatives clients. Returns did not impact the amount of commission paid. Through its commission payments, ABH incentivized its sales staff to encourage medical providers to overuse Dermagraft.

154.   ABH disseminated numerous documents encouraging medical providers to use Dermagraft for all eight applications, notwithstanding the fact that the average wounds treated with Dermagraft healed after three to five treatments, such that any further applications of Dermagraft were medically unnecessary. For example, on or around February 14, 2008, an ABH representative left a document titled "Medicare Physician Office Treatment with Dermagraft with 15004" at physicians' offices. The document encouraged eight applications by providing the revenue physicians could earn if they applied Dermagraft eight times to a given patient.

155.   Indeed, on information and belief, a medical provider applied Dermagraft 60 times to one wound on a particular patient at a Veterans Affairs medical facility.

71

156.   ABH's encouragement that medical providers overuse Dermagraft illegally imposed unnecessary health costs on federal and state governments.

157.   Defendant implemented a scheme to circumvent the approved uses and labeling of Dermagraft in order to induce increased sales and prescription of Dermagraft through various illegal means.  The scheme included marketing efforts so egregious that they led to misbranding Dermagraft, are evidence of misbranding Dermagraft, or both.

158.   In addition to causing the submission of false or fraudulent claims, Dermagraft's marketing of Dermagraft for off-label and unapproved purposes put patients at risk.  Applying Dermagraft for off-label purposes could prolong the duration of patients' illnesses, diminish their quality of life, increase their risk of infection and need to amputate, and possibly cause death.

### C.   ABH Induced Medical Providers To Purchase Dermagraft Based on Representations Regarding Profitability

159.   As part of its scheme to defraud Government Health Care Programs, such as Medicare and Medicaid, ABH marketed Dermagraft by emphasizing its profitability and by comparing its profitability to the profits medical providers could earn by treating patients with Apligraf – instead of marketing based on efficacy, clinically proven standards, or medical necessity.  In doing so, ABH emphasized that Dermagraft required more applications than Apligraf, which would result in greater revenue.  This type of marketing occurred on numerous

occasions during the relevant period and resulted in medically unnecessary Dermagraft treatments. The following are examples.

160. On or around October 1, 2007, ABH was at St. Luke's Hospital promoting Dermagraft in part by describing how medical providers could make more money using Dermagraft.

161. On February 6, 2008, Tommy Miller, an Advanced Technology Specialist at ABH, and Lorie Myers, an Inside Sales Specialist at ABH, faxed Judy Simpson, the Clinic Manager of a medical provider, Dermagraft marketing material. Included in the material was a letter to "Physicians, Surgical Staff and Medical Staff" stating that, "[i]n addition to achieving successful healing outcomes for your patients, it is our goal to make reimbursement for Dermagraft a financial success for you."

162. On or around February 14, 2008, an ABH representative left a document titled "Medicare Physician Office Treatment with Dermagraft with 15004" at a physician's office. The document summarized medical providers' gross and net revenue associated with using Dermagraft. As the following excerpt shows, it was clearly intended to demonstrate that Dermagraft was a revenue-

generating product for medical providers.

Medicare Physician Office Treatment with Dermagraf® with 15004



| Billing Code | | | | | Application | | | |
|---|---|---|---|---|---|---|---|---|
| J 7342 | 1,377.00 | 1,377.00 | 1,377.00 | 1,377.00 | 1,377.00 | 1,377.00 | 1,377.00 | 1,377.00 |
| 15365* | 344.69 | 344.69 | 344.69 | 344.69 | 344.69 | 344.69 | 344.69 | 344.69 |
| 11040/11041 | x | x | x | x | x | x | x | x |
| Total Per Procedure | 1,721.69 | 1,721.69 | 1,721.69 | 1,721.69 | 1,721.69 | 1,721.69 | 1,721.69 | 1,721.69 |
| Gross Revenue | 1,721.69 | 3,443.38 | 5,165.07 | 6,886.76 | 8,608.45 | 10,330.13 | 12,051.82 | 13,773.51 |

| One piece of Dermagraft Purchased at $1,365.00 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cost of Product | 1,365.00 | 2,730.00 | 4,095.00 | 5,460.00 | 6,825.00 | 8,190.00 | 9,555.00 | 10,920.00 |
| Net Revenue | 356.69 | 713.38 | 1,070.07 | 1,426.76 | 1,783.45 | 2,140.13 | 2,496.82 | 2,853.51 |

| 15004 (optional) - not included in totals | 383.92 | x | x | x | x | x | x | x |
|---|---|---|---|---|---|---|---|---|

163.   This document also encouraged medical providers to conduct

medically unnecessary treatments.  It illustrated the revenue medical providers

could earn for eight applications of Dermagraft, notwithstanding the fact that, on

average, wounds treated with Dermagraft healed after three to five applications.

On average, then, any further application would be medically unnecessary.

164.   On January 6, 2009, Jeff DeVincent, an Advanced Technology

Specialist for ABH, sent an email to approximately 20 medical providers, including

Katie Cunningham, Rusty Cain, Jennifer Duvall, and James Feltner, that contained

an attachment stating that "Medicare reimbursement rates for HOPD/WCC for the

application CPT-15365 Code has more than *'doubled'*.  2008 application/procedure

74

82

$134 per application[.]  **New 2009 application/procedure $277 per Dermagraft application."

165.   On or around May 8, 2009, an ABH representative left a marketing document at the wound care center at the Glen Falls Hospital in New York.  The document, titled "HOSPITAL OUTPATIENT WOUND CARE MODEL," compared the profitability of Dermagraft to the profitability of Apligraf for physicians and wound care centers in 2009.  It showed revenues based on assumptions of 1, 5, and 10 new patients per month; 12, 60, and 120 new patients per year; 5 Dermagraft applications per patient; and 2 Apligraf applications per patient.  Based on those assumptions, it then compared Dermagraft's and Apligraf's per-procedure Medicare revenue, total per-patient revenue, and total net revenue annualized for physicians and wound care centers in order to demonstrate that using Dermagraft would be significantly more profitable for medical providers.  In doing so, it emphasized the fact that Dermagraft typically heals after five applications and thus generates greater revenue than using Apligraf, which typically heals after two applications.

166.   On August 17, 2009, Jeff DeVincent emailed approximately 30 physicians, including Rusty Cain, Alexandre DeSouza, Pamela Jett, Teresa Cottle, and Angie Washington, to inform them that "**WV Medicaid** is now officially reimbursing for the product Dermagraft . . . and the application/procedure."  He

83

proceeded to explain the costs and net revenue associated with treating patients with Dermagraft.

167.  On September 29, 2009, a physician contacted Organogenesis by email to report frustration with ABH's strategy of promoting Dermagraft based on revenue. The email stated that a representative of ABH "t[ried] to gain access to CFO of Hospital Systems to present revenue data to them that is illegal in the eyes of the FDA. This representative has approached and pitched a presentation to several area hospital CFO's talking about how their product increases revenue and how it impacts the bottom line in a years time."

168.  On information and belief, on or around December 16, 2009, Sean McCormack, the National Sales Director, Eastern United States, for ABH, provided his sales team a draft marketing email to medical providers in which he wrote, "I would be delighted to meet with your group and show a very detailed economic model on how Dermagraft delivers a positive revenue flow as well as what we are about to launch with patients that are Medicare only with no supplement."

169.  On or around January 26, 2010, ABH disseminated a marketing document comparing the profitability of using Apligraf to the profitability of using Dermagraft. ABH used the document for marketing purposes in or around January 2010.

76

170.   In Jennifer Linsky's February 15, 2010, draft marketing email that she sent ABH staff members Brian Vinca and Rick Martin, she included in the letter to Dermagraft customers that "Dermagraft continues to provide the most clinical and economical benefit when treating your diabetic ulcer patients. . . . [T]his email . . . will help to ensure all parties get maximum reimbursement for 2010." The letter then summarized Medicare's reimbursement rates for medical services relating to Dermagraft.

171.   During a coding talk at the New York Podiatric Clinical Conference in January 2008, Dr. Paul Kesselman, who worked as a paid consultant to ABH, said during a talk, "if you want to make money, use [Dermagraft]." He then suggested improperly and unlawfully using code modifiers to increase profits.

172.   In an August 20, 2009, email, a Dermagraft customer explained that a primary reason for the customer's decision to use Dermagraft over Apligraf was the financial advantage.

173.   In the following undated marketing document entitled "Hospital Outpatient Department," created and disseminated by ABH, ABH again marketed Dermagraft based on its profitability.



## Outpatient Department

| ID | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 |
|---|---|---|---|---|---|---|---|---|
| COST | $1,419 | $1,419 | $1,419 | $1,419 | $1,419 | $1,419 | $1,419 | $1,419 |
| Q4106 | 1491.50 | 1491.50 | 1491.50 | 1491.50 | 1491.50 | 1491.50 | 1491.50 | 1491.50 |
| 15365 | 227.34 | 227.34 | 227.34 | 227.34 | 227.34 | 227.34 | 227.34 | 227.34 |
| WEEKLY NET GAIN | 293.84 | 293.84 | 293.84 | 293.84 | 293.84 | 293.84 | 293.84 | 293.84 |
| NET REVENUE | 293.84 | 587.69 | 881.52 | 1,175.36 | 1,469.20 | 1,763.04 | 2,056.88 | 2,350.72 |

Example: 5 patients per month @ 5 weekly applications = $ 7,346.00 per month
= $ 88,152.00 per year

## Physician

| ID | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 |
|---|---|---|---|---|---|---|---|---|
| 15365 | 277.35 | 277.35 | 277.35 | 277.35 | 277.35 | 277.35 | 277.35 | 277.35 |
| NET REVENUE | 277.35 | 554.7 | 832.05 | 1,109.40 | 1,386.75 | 1,664.10 | 1,941.45 | 2,218.80 |

Example – 5 patients per month @ 5 weekly applications = $ 6,933.75 per month
= $ 83,205.00 per year

DESCRIPTIONS:
Q4106 – Billing code specifically for Dermagraft, billed at 38 units
15365 – Billing code for professional service to apply Dermagraft



**Dermagraft**
*Get Closure*                                                        visit us at www.dermagraft.com

174. ABH induced medical providers to purchase and administer

Dermagraft through an unlawful marketing scheme that emphasized profitability

instead of efficacy and intentionally encouraged overutilization of Dermagraft,

which increased medical costs and victimized patients and government payers.

78

**D.     ABH Encouraged Medical Providers To Bill Improperly By Misusing CPT and ICD-9-CM Codes To Induce Sales of Dermagraft**

175.    Defendant improperly and unlawfully marketed and induced sales of Dermagraft by encouraging medical providers to improperly bill for site preparation, debridement, and active wound care management, as well as Modifier 58 and a Code unrelated to Dermagraft (Code 15777), in order to defraud Government Health Care Programs, such as Medicare and Medicaid.

*Encouraging Medical Providers To Bill Improperly for Site Preparation*

176.    On or around 2008, and possibly after, ABH attempted to induce sales of Dermagraft by encouraging medical providers to fraudulently or falsely seek payment for Site Preparation Codes when site preparation was not medically necessary in order to increase their profits.  Specifically, ABH encouraged medical providers to use Site Preparation Codes routinely on the first date they administered Dermagraft to patients, instead of encouraging them to use of those Codes only when site preparation was appropriate and medically necessary. Routinely seeking reimbursement from Government Health Care Programs for Site Preparation Codes constituted submission of false or fraudulent claims.

177.    As explained above, it may have been medically necessary for medical providers to conduct, and therefore seek reimbursement for, site preparation for simple debridement of granulation tissue or recent avulsion on the

79

first date a medical provider administered Dermagraft to a patient in certain cases. *See supra* ¶ 119(e). As part of ABH's fraudulent or illegal marketing scheme, however, it attempted to induce sales of Dermagraft by encouraging medical providers to routinely bill, and thus misuse, the Site Preparation Codes to Government Health Care Programs, regardless of whether site preparation was medically necessary.

178. On or around February 14, 2008, an ABH representative disseminated a document entitled "Medicare Physician Office Treatment with Dermagraft with 15004" to a medical provider. *See supra* ¶ 154. The document improperly characterized the 15004 Site Preparation Code as "optional" on the first date Dermagraft was applied – disregarding the fact that such site preparation is medically necessary, and thus appropriate to bill Government Health Care Programs, in limited circumstances.

179. By disseminating this marketing material, ABH knowingly and/or intentionally encouraged the submission of false or fraudulent claims to Government Health Care Programs, such as Medicare and Medicaid.

180. In or around 2008, ABH stopped encouraging the misuse of the Site Preparation Codes and instead began encouraging the misuse of Debridement Codes.

### *Encouraging Medical Providers To Bill Improperly for Debridement*

181.   Beginning in or around 2008 and until in or around 2012, ABH attempted to induce sales of Dermagraft by encouraging medical providers to improperly seek payment for Debridement Codes when debridement was not medically necessary in order to increase their profits.

182.   As explained above, when debridement was medically necessary, medical providers typically conducted, and thus could seek reimbursement for, debridement of tissue before Dermagraft was administered to a patient. *See supra* ¶ 119(c). This is in part because the Application Codes included some cleaning of the wound that was medically necessary on the date a medical provider administered Dermagraft to a patient.

183.   ABH, however, encouraged medical providers to routinely bill the Debridement Codes on the same date they administered Dermagraft to the patient.

184.   ABH also encouraged medical providers to routinely bill Debridement Codes, Site Preparation Codes, and Application Codes on the same date.

185.   These coding schemes constitute fraudulent or false, off-label billing and misuse of the Debridement Codes. ABH encouraged this improper billing on numerous occasions.

81

### *Encouraging Medical Providers To Bill Improperly for Active Wound Care Management*

186.   During at least a portion of the relevant period, ABH encouraged medical providers improperly to seek payment for Active Wound Care Management Codes when active wound care management was not medically necessary in order to increase their profits, and thus to induce sales of Dermagraft.

187.   For example, on or around October 1, 2007, ABH promoted Dermagraft at St. Luke's Hospital in part by encouraging improper use of the Active Wound Care Management Codes.

188.   As explained above, active wound care management was not medically necessary for all patients to whom medical providers administered Dermagraft. *See supra* ¶ 119(d). As a matter of medical procedure, if active wound care management was medically necessary, medical providers typically conducted, and thus could seek reimbursement for, active wound care management after debridement and before Dermagraft was administered to a patient. *See id.* But active wound care management was not routinely medically necessary, and thus medical providers should not have routinely billed for it, on the date a medical provider administered Dermagraft or on the date a medical provider conducted debridement. *See id.*

82

90

189.   ABH, however, encouraged medical providers to routinely bill Active Wound Care Management Codes on the date they administered Dermagraft to patients.

### Encouraging Misuse of Modifier 58

190.   From on or around February 15, 2007, until the end of 2011, Defendant encouraged overutilization of Dermagraft and the submission of false or fraudulent claims for coverage of procedures relating to Dermagraft by suggesting that medical providers could increase their revenue by misusing a coding modifier – Modifier 58 – to circumvent the 90-day global period of service.

191.   As explained above, Modifier 58, when used properly, may be used to report a staged or related surgical procedure or service by the same physician during the postoperative period. *See supra* ¶ 122. Specifically, it applies, and it applied throughout the relevant period, in three scenarios: when the performance of a procedure or service during the post-operative period was either planned or anticipated (*i.e.*, "staged"), was more extensive than the original procedure, or was for therapy following a surgical procedure. To report any of those circumstances, a medical provider may add Modifier 58 to the staged or related procedure. The relevant effect of adding Modifier 58 in conjunction with a medical procedure is that it allows medical providers to be paid at each stage of a medical procedure – *i.e.*, each time the medical provider treats the patient.

192.   Treating a patient with Dermagraft involves potentially multiple, separate procedures during which a medical provider administers Dermagraft to the patient.  That does not fit within any of the three scenarios for which Modifier 58 is appropriate.  Accordingly, Modifier 58 does not apply to Dermagraft

193.   ABH, however, encouraged medical providers to fraudulently and falsely add Modifier 58 in order to circumvent the 90-day global period that applied to Dermagraft through 2011.  Adding Modifier 58 communicated to Government Health Care Programs that they should ignore the 90-day billing window for Dermagraft.  Accordingly, doctors who used Modifier 58 in conjunction with Dermagraft could fraudulently or falsely bill, and receive payment from Government Health Care Programs, for each application of Dermagraft, instead of billing, and receiving payment, for only the first application of Dermagraft within a given 90-day period.

194.   ABH began improperly suggesting the misuse of Modifier 58 on or around the beginning of the relevant period.  Indeed, an internal ABH document for "Internal Educational Use ONLY," dated February 3, 2007 – before ABH began selling Dermagraft – suggested that Modifier 58 could be used with Dermagraft.

195.   On or around August 20, 2007, an ABH document for "INTERNAL USE ONLY" containing ABH's talking points included a recommendation that medical providers improperly use Modifier 58 in relation to Dermagraft.  Among

the talking points under the heading, "HISTORICAL INFORMATION," the document states that "AMA correspondence with Smith & Nephew confirmed that modifier 58 was appropriate for use with CPT 15342 to best identify Dermagraft's staged application procedure," and that "[t]he usage of modifier 58 with CPT 15342 was also detailed as appropriate in the official CPT coding books published by the AMA." Under "CURRENT," the document states that "[t]he AMA also clarified that the use of modifier 58 is appropriate when Dermagraft is 'performed as a separate, additional procedure occurring within the global period assigned by insurers.'"

196.    In an ABH marketing document dated June 21, 2008, summarizing TrailBlazer's LCD, ABH represented that the use of Modifier 58 in conjunction with Dermagraft would be appropriate.

197.    In Jeff DeVincent's January 6, 2009, email to approximately 20 medical providers, he wrote that medical providers could add a Modifier 58 when seeking Medicare payments for the Application Code for the second through eighth applications of Dermagraft. *See supra* ¶ 164.

198.    On February 10, 2009, Dr. William Mangold – the medical director of Noridian Administrative Services, a private insurance carrier that administered and paid claims on behalf of CMS – responded to an email from Dr. Barbara Aung. Dr. Aung asked Dr. Mangold for:

help in trying to understand something that the Dermagraft representative has just provided to me. . . . I was under the impression that 15365 [an Application Code for Dermagraft] has a 90 day global, would that not prevent me from billing for this procedure within the 90 day. The rep then states that I should use a -58 modifier each week and that I would be reimbursed for the application. Would this be a correct impression? Also if I perform this in a hospital owned out patient wound center, would the facility be able to bill for the product code Q4106 each week that I would apply the product? And wou[l]d the facility be able to charge a facility fee each week, and I would be able to charge for the application code each week?

In response, Dr. Mangold explained that Dr. Aung was:

correct that CPT 15365 is a 90-day code and cannot be appropriately billed more frequently, even with the use of the -58 modifier. We have made that point very clear to manufacturers and CMS agrees . . . . We consider this use of the -58 modifier to be incorrect coding at best, and potentially fraudulent. . . . Bottom line, I would recommend you use and bill the service consistent with the Noridian LCD and with the fee schedule description of 15365 as a 90-day global period service.

199.   Nevertheless, a document created by ABH, titled "Dermagraft Q2 2009 Medicare Coding, Coverage and Payment," stated that medical providers could use Modifier 58 on the second through eighth applications of Dermagraft.

200.   On or around May 8, 2009, an ABH representative left a marketing document at the wound care center of the Glen Falls Hospital in New York. The document compared the profitability of Dermagraft to the profitability of Apligraf for physicians and wound care centers in 2009. *See supra* ¶ 165. In order to calculate total per-patient revenue for physicians and wound care centers that used Dermagraft, ABH included payment for the procedure of administering Dermagraft

86

94

product to a patient on each patient visit.  For example, it stated that if a physician administered Dermagraft five times to one patient per month at a rate of $277 per application, the physician would earn $1,385 in revenue per patient.  If billed properly and without a Modifier 58, a physician would seek, and receive, only $277 for all five applications of Dermagraft, because the 90-day global period of service permitted only one payment for application of Dermagraft for every 90 days.  Accordingly, ABH's marketing document implicitly suggested that physicians should add a Modifier 58 for each application of Dermagraft, which would allow them to receive $277 for each of the five applications of Dermagraft, resulting in $1,385 in revenue.

201.   As another example, in Jennifer Linsky's draft marketing email to ABH staff members Brian Vinca and Rick Martin on February 15, 2010, she encouraged medical providers to use Modifier 58 on the second through eighth applications of Dermagraft.  She also wrote, "I have attached a copy of the HOPD coding/reimbursement information, as well as the CPT Assistant from the American Medical Association, restating the use of the 58 modifier with the application of Dermagraft, for your review since I mentioned its acceptance by Medicare in our discussions last week."  A document appears below her signature block stating, "AMA correspondence with Smith & Nephew confirmed that modifier 58 was appropriate for use with CPT 15342 to best identify Dermagraft's

staged application procedure. The usage of modifier 58 with CPT 15342 was also detailed as appropriate in the official CPT coding books published by the AMA." The attachment also states, "[t]he AMA also clarified that the use of modifier 58 is appropriate when Dermagraft is 'performed as a separate, additional procedure occurring within the global period assigned by insurers.' Once approved for application, Modifier -58 is added to Dermagraft applications #2 through #8."

202.   ABH's marketing materials demonstrate that Dermagraft, when used in conjunction with Modifier 58, enabled medical providers to receive more revenue per patient, by receiving payments for each application of Dermagraft, than the 90-day global period of service allowed.

203.   This aspect of ABH's scheme ended at or around the end of 2011. At the beginning of 2012, CMS changed the compensation scheme for medical providers administering Dermagraft by, *inter alia*, applying a 0-day global period of service to the Application Codes for Dermagraft, which allowed medical providers to receive payment for each application of Dermagraft.

204.   ABH's suggested use of Modifier 58 from on or around February 15, 2007, until on or around the end of 2011 caused the submission of false or fraudulent claims and dramatically increased costs to Government Health Care Programs, such as Medicare and Medicaid, while simultaneously increasing co-pays for beneficiaries.

## *Encouraging Off-Label Use of and Improper Billing for Code 15777*

205. As part of Defendant's illegal marketing scheme to induce sales of

Dermagraft, it encouraged medical providers to bill Code 15777, which was off-

label for and unrelated to Dermagraft. Code 15777 related to biologic implant for

soft tissue reinforcement and was not approved for use with Dermagraft. It applied

to procedures such as breast augmentation.

206. On January 4, 2012, Matthew Eldridge, a Regional Sales Director at

ABH, emailed ABH's 2012 codes for skin substitute grafts to Jennifer Springer

(Wound Care Front Office Coordinator & Hyperbaric Technician at Coastal

Carolina Hospital), Sally Sisson (an employee or affiliate of Tenet Healthcare – an

investor-owned health care services company that operated numerous hospitals and

outpatient centers – of which Ms. Springer was also an employee or affiliate), and

Lori Gilbert (an Organogenesis employee). In the email, ABH encouraged using

Code 15777 for medical procedures relating to Dermagraft. Using Code 15777

with Dermagraft constituted off-label use.

### E.    ABH Intentionally Inflated the Dermagraft ASP

207. As part of its fraudulent scheme, ABH also knowingly inflated

Dermagraft's ASP in numerous ways. Many Government Health Care Programs

determine the amount they will pay for drugs and other products, such as

Dermagraft, based upon the product's ASP. ASP is determined by information

89

97

reported by companies manufacturing the product. By inflating the ASP of Dermagraft, ABH induced medical providers to purchase Dermagraft by enabling ABH's clients to recover more money from Government Health Care Programs for Dermagraft product administered to patients than the medical providers paid ABH to receive the product, and thus caused Government Health Care Programs to pay inflated amounts for Dermagraft. Examples of ABH's intentional inflation of Dermagraft's ASP are described above, *see supra* ¶¶ 131-136, and summarized below.

208.   ABH paid clients money per piece of Dermagraft used. For example, on or around June 10, 2009, ABH had an arrangement with a clinical manager providing money "per piece [of Dermagraft] used." On numerous occasions, ABH sales representatives used their expense budgets to give medical providers approximately $100 in cash per piece of Dermagraft they ordered from ABH. *See supra* ¶ 131(b). ABH also compensated physicians for speaking engagements and/or for sham research at above-market rates, *see id.* ¶ 131(c); provided gifts, such as gift certificates and gift cards to restaurants, free walkers, and event tickets, *see id.* ¶ 131(d)-(f); and paid the entire cost of marketing campaigns that co-promoted Dermagraft with a hospital, physician, or wound care center, *see id.* ¶ 131(m). These constituted illegal kickbacks and attempts to induce Dermagraft sales by effectively inflating its ASP.

209.   On information and belief, ABH failed to include the payments to customers who purchased Dermagraft in the relevant ASP computations in order to avoid reducing the ASP, as it was critical to Dermagraft marketing efforts that Dermagraft remain a more profitable product for prescribing physicians than any competitor product.

210.   As detailed above, ABH also offered some providers a "risk free trial" of Dermagraft, allowed customers to return unused Dermagraft at no charge, wrote off patient co-pays, forgave providers' obligations to pay for Dermagraft when they failed to receive payment from Government Health Care Programs, and even offered to write checks to physicians to reimburse them for payments relating to Dermagraft that Government Health Care Programs denied. *See supra* ¶ 131.

211.   Moreover, ABH discounted the price of Dermagraft for providers, sometimes after invoicing customers in order to inflate ASP. On or around January 7, 2008, Dr. Isa Schwarzberg, who was partners with Dr. Greg Rubenstein in Teaneck, New Jersey, asked Dr. Rubenstein why he was using Dermagraft. Dr. Rubenstein explained that he was not paying the $1,300 per unit in the invoice from ABH; instead, he was paying ABH $1,000 for Dermagraft, which allowed him to make a profit. Also, in Keith O'Briant's January 25, 2008, letter to Brian D. Pollick, the Director of Material Management at IASIS Healthcare, located at 117 Seaboard Lane, Building E, Franklin, Tennessee 37067, Mr. O'Briant offered

Dermagraft for $1,270 per piece, which amounted to a 7% discount off of

Dermagraft's normal price of $1,365 per piece. Mr. O'Briant provided two options

for completing the transaction: ABH could invoice Mr. Pollick for $1,270 when

the order was placed, or rebate Mr. Pollick $95 for each piece bought at the end of

each month.

212.   Defendant's payments and discounts to Dermagraft purchasers should

have been included in Defendant's ASP calculations for Dermagraft, which were

reported to CMS pursuant to 42 C.F.R. § 414.804.  Defendant's payments and

discounts should have been included as a price concession, pursuant to 42 C.F.R. §

414.804(a)(2), in calculating the ASP for Dermagraft.  Defendant's failure to

include these payments in its ASP calculations for Dermagraft caused the quarterly

ASP for Dermagraft to be overstated as reported, and certified, to CMS.

213.   Defendant's failure to incorporate the above-described conduct,

including payments to and discounts for Dermagraft clients, in its Dermagraft ASP

calculations inflated the reported ASP for Dermagraft.  As a result, Government

Health Care Programs were harmed as follows:  (1) State Medicaid programs that

utilized the ASP reimbursement methodology, which is the mandated

reimbursement methodology utilized by the Medicare program, overpaid for

Dermagraft claims (including as to any federal funding for payment of those

claims); (2) State Medicaid and Federal Medicare programs overpaid for dually-

eligible Medicare/Medicaid beneficiaries; and (3) other Government Health Care Programs, including Medicare, which used the ASP reimbursement methodology (the mandated reimbursement methodology utilized by the Medicare program beginning in 2005), overpaid for Dermagraft claims. Most, if not all, Dermagraft claims during the relevant period were overpaid because of the inflated Dermagraft ASP.

214.   Most, if not all, physician and hospital purchases of Dermagraft between on or around February 15, 2007, and on or around January 16, 2014, were tainted by improperly overstated ASP for Dermagraft and thus caused related claims to be false or fraudulent.

## ABH KNEW ITS CONDUCT CAUSED FALSE CLAIMS

215.   Defendant intentionally and knowingly caused medical providers to submit false or fraudulent claims relating to Dermagraft to Government Health Care Programs.

216.   As an initial matter, ABH knew that medical providers administering Dermagraft would likely submit claims to Government Health Care Programs for payment. A Shire plc press release on May 17, 2011, stated that, "DERMAGRAFT has a favorable reimbursement profile, with Medicare (100% coverage), more than 1,000 private plans, the Veteran's Administration, and numerous Medicaid programs." *See* Shire plc Press Release, *Shire to establish new Regenerative*

Medicine business unit through cash acquisition of Advanced BioHealing, Inc.

(May 17, 2011), available at

http://www.shire.com/shireplc/en/investors/investorsnews/irshirenews?id=483

(accessed Feb. 5, 2014) ("Shire May 2011 Press Release").

217.   ABH's current website, www.dermagraft.com, also acknowledges as

much. See Dermagraft Website, 2013 Reimbursement Updates, available at

http://www.dermagraft.com/updates/ (accessed Feb. 7, 2014) ("CMS continues to

reimburse Dermagraft based on ASP + 6% in the Physician Office setting.

Reimbursement for Dermagraft in the Hospital Outpatient Setting is now at ASP +

6% up from ASP + 4% in 2012.").

218.   Indeed, ABH offered a "Dermagraft Reimbursement Hotline . . .

committed to ensuring that physician and facility providers receive continuous

support when treating their patients with Dermagraft," which, inter alia, offered to

help "[v]erify insurance coverage and benefits for patients."  See Dermagraft

Website, Reimbursement Support, available at

http://www.dermagraft.com/reimbursement-support/ (accessed Feb. 9, 2014).

219.   Moreover, ABH knew the above-described conduct was wrongful or

fraudulent and that it would cause the submission of false or fraudulent claims.

220.   As explained above, ABH improperly guaranteed Dermagraft

purchasers coverage by Government Health Care Programs, such as Medicare and

94

Medicaid, for procedures relating to Dermagraft on numerous occasions. *See supra* ¶ 131. Had ABH believed its customers would not seek reimbursement from Government Health Care Programs, it would have had no reason to make such offers. Not to mention, it is unlikely that ABH could have enforced its guarantee if its customers did not receive reimbursement from Government Health Care Programs in many, if not most, cases.

221. Moreover, on or around December 11, 2008, an ABH representative left charts at a wound care center in Tacoma, Washington, as part of its fraudulent or illegal marketing campaign, that were on paper that showed "VOID" when reproduced in order to conceal improper marketing based on representations about Dermagraft's profitability. A scanned excerpt of such a document is below.

95



222.   In or around 2008, ABH began discouraging misuse of the Site Preparation Codes because private insurance carriers that administered and paid claims on behalf of CMS began including in their LCDs that the Site Preparation Codes were not indicated for use with Application Codes. ABH instead began encouraging the misuse of Debridement Codes.

223.   As described above, Ms. Gray's email, the Checklist, and similar ABH documents demonstrate clear intent to misconstrue the applicable Medicare and Medicaid coverage policies and cause physicians to submit false or fraudulent

claims for payment to Government Health Care Programs, such as Medicare and Medicaid. False and misleading statements that were part of ABH's off-label marketing campaign implying that Dermagraft would be covered when applied to burns and ulcers located on various areas of the leg, which uses were not FDA-approved, could cause providers to prescribe Dermagraft to Medicare patients for indications that were not eligible for Medicare reimbursement.

224. Finally, in Shire plc's January 16, 2014, press release, it acknowledged that one reason it sold Dermagraft to Organogenesis was a "recent Medicare ruling regarding reimbursement for DERMAGRAFT, [and that as a result] the business environment has changed, and the prospects for the product have reduced significantly." *See* Shire plc Press Release, *Shire Executes Agreement to Divest DERMAGRAFT* (Jan. 17, 2014), *available at* http://www.shire.com/shireplc/en/investors/investorsnews/irshirenews?id=913 (accessed Feb. 5, 2014). The Medicare ruling reduced Medicare payments to medical providers treating patients with Dermagraft or Apligraf.

225. ABH knowingly and deliberately caused medical providers to submit false or fraudulent claims to Government Health Care Programs.

## CLAIMS SUBMITTED AND DAMAGES CAUSED TO GOVERNMENT HEALTH CARE PROGRAMS

226. Defendant's actions described herein have caused the submission of false or fraudulent claims, and they have made and used, and/or caused to be made

and used, false records and statements for the purpose of having false or fraudulent

claims for Dermagraft, and procedures related to Dermagraft, submitted to, paid

by, and/or approved by Government Health Care Programs, including Medicaid

and Medicare.

227.   According to ABH's website for Dermagraft, more than "90,000

patients have received Dermagraft since 2007." Dermagraft Website, *Proven DFU*

*results and extensive DFU experience, available at*

http://www.dermagraft.com/proven-results/ (accessed Feb. 9, 2014).

228.   As mentioned above, the Shire May 2011 Press Release demonstrated

ABH's knowledge that its Dermagraft clients were submitting claims for

reimbursement. *See* Shire May 2011 Press Release.

229.   In addition, approximately 60% to 70% of medical providers who

treated patients with Apligraf sought payment from Medicare and Medicaid during

the relevant period.  On information and belief, it is likely that a similar percentage

of providers who treated patients with Dermagraft sought payment from Medicare

and Medicaid during the relevant period.

230.   Among other things, claims filed with Government Health Care

Programs – including UB-04 forms, CMS-1500 forms, and 837P forms – have

contained false or fraudulent statements and material omissions because of

Defendant's actions.

231. Defendant's actions have also caused medical providers who received benefits as a kickback to violate the conditions of their receipt of Medicare reimbursements, including the certification that they would comply with the AKS as a condition for the receipt of Medicare reimbursements.

232. Defendant's actions have also caused medical providers who received benefits as a kickback to file false certifications with Government Health Care Programs, including pursuant to Form CMS-855, that they were in compliance and/or would comply with the AKS.

233. There is evidence that Defendant has caused many medical providers purchasing and/or prescribing Dermagraft to provide false certifications on Forms CMS-855A and CMS-855I during the time that Defendant was providing Dermagraft to those medical providers and their patients.

234. The Provider Enrollment Chain and Ownership System ("PECOS") is a mandatory national enrollment system administered by CMS. It allows physicians and practice groups to enroll in Medicare or to make a change to their Medicare enrollment information online.

235. Enrollment in PECOS requires a medical provider to recertify compliance with the AKS at that time. Specifically, when enrolling in PECOS, a medical provider either must complete the paper Medicare enrollment application and certification by completing the appropriate Form CMS-855A or CMS-855I

(including certification of compliance with federal law and the AKS), or must complete an online enrollment, followed by submission of a two-page hard copy certification statement that requires the same certification as Forms CMS- 855A and CMS-855I.

236.   CMS requires all medical providers that receive Medicare reimbursements, and who have not submitted a CMS-855 enrollment form since 2003, to enroll in PECOS through either of the processes described above, both of which require contemporaneous recertification by the medical provider of compliance with federal laws, including the AKS.

237.   The PECOS registration requirement is mandatory and governing regulations provide that medical providers not enrolled in PECOS will not receive Medicare reimbursements.  By 2010, most medical providers had enrolled in PECOS (and, in doing so, had recertified their compliance with federal law, including the AKS, as a condition of receiving Medicare reimbursements).

238.   Other common circumstances regularly require medical providers to submit Forms CMS-855A or CMS-855I, along with contemporaneous certification of compliance with federal law and the AKS.  For example, CMS requires the submission of a new CMS-855A enrollment form in the event of an acquisition, merger, or consolidation of a medical practice enrolled in Medicare.

100

239.   Further, in the event of a change of ownership of a practice enrolled in

Medicare, the new owner can either submit a new enrollment form (with

certification), or assume the obligations of the existing provider agreement through

an assignment process.  Where an agreement is assigned to the new owner, the new

owner specifically assumes the agreement subject to "all applicable statutes and

regulations and to the terms and conditions under which it was originally issued."

42 C.F.R. § 489.18(d).

240.   Institutional medical providers must also complete the CMS-855A

certification whenever they reactivate a Medicare enrollment, voluntarily terminate

a Medicare enrollment, revalidate their Medicare enrollment, or change any of

their Medicare information, including identifying information, practice location

information, payment address and medical record storage information, ownership

interest and/or managing control information, chain home office information,

billing agency information, special requirements for home health agencies,

authorized officials, delegated officials, or information about adverse legal

actions/convictions.

241.   Similarly, physicians and other practitioners must complete a version

of Form CMS-855I, including the certification of compliance with federal law

including the AKS, whenever they change any of their Medicare information,

including identifying information, practice location information, payment address

101

and medical record storage information, information about individuals having managing control, final adverse actions/convictions, and billing agency information. Recertification of compliance is also required when physicians and other practitioners enroll with another fee-for-service contractor, reactivate their Medicare enrollment, voluntarily terminate their Medicare enrollment, or revalidate their Medicare enrollment. Physicians and other practitioners are also required generally to notify the government if any of the certifications or statements on the form change.

242. As of November 2009, the majority – *i.e.*, on the order of 70% – of all Medicare-eligible medical providers (including physicians and medical practices) had re-enrolled in Medicare since 2003, including for the above reasons.

243. Defendant has marketed Dermagraft in a way that has compromised physicians' independent medical judgment and threatened patient safety through, among other things, the use of kickbacks, the promotion of billing for services not rendered, the payment of "discounts" to customers, and the other inducements offered by Defendant.

244. The impact of Defendant's misconduct is all the more profound on Government Health Care Programs, given that Dermagraft's ASP has been artificially inflated by Defendant, in an amount estimated to be between approximately 10% and 20%.

245. Defendant's improper inducements caused medical providers to submit false or fraudulent provider certifications that they were in compliance with the federal and state Anti-Kickback laws.

246. Compliance with the Anti-Kickback laws is a precondition to payment by the Medicare program, and by other Government Health Care Programs. By virtue of Defendant's provision of kickbacks to medical providers, the Medicare program and other Government Health Insurance Programs: (1) reasonably and foreseeably paid medical providers for services provided based on Defendant's misbranding of Dermagraft; (2) reasonably and foreseeably paid medical providers for provider-administered and prescribed Dermagraft that they would not have otherwise ordered or prescribed; (3) reasonably and foreseeably paid for renewed and continuing treatments of Dermagraft for patients who might not have otherwise received that treatment; and (4) reasonably and foreseeably paid for Dermagraft, which provided additional reimbursement as compared to other alternatives, such as Apligraf.

## CLAIMS FOR RELIEF

### COUNT 1:
### VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A)

#### False or Fraudulent Claims, Statements, and Records

247. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

248.   This is a civil action brought by Relator on behalf of the United States against Defendant under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733.

249.   Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendant has violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

250.   Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to CMS or its agents, or other Government Health Care Programs.

251.   Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

252.   Government Payors, unaware of these violations of the Federal FCA and the false or fraudulent nature of the claims presented or caused to be presented, and in reliance on the accuracy of these claims, paid for purported medical products and services performed for patients insured by federally funded health insurance programs, including Medicare, Medicaid, and CHAMPUS/TRICARE. Had the United States known that the bills presented by Defendant, or that Defendant caused to be presented, were false or fraudulent, payment would not have been made for such claims.

104

253.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the United States to suffer damages.

254.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1) and (3).

## COUNT 2:
## VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)

### False or Fraudulent Claims, Statements, and Records

255.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

256.   This is a civil action brought by Relator on behalf of the United States against Defendant under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733.

257.   Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, Defendant has violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

258.   Defendant made, used, or caused to be made or used false or fraudulent records or statements.

259.   These false records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to CMS or its agents, or other Government Health Care Programs.

260.   Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

261.   Government Payors, unaware of these violations of the Federal FCA and the false or fraudulent nature of the records or statements made, used, or caused to be made or used, and in reliance on the accuracy of these records or statements or the false or fraudulent claims to which these records or statements were material, paid for purported medical products or services performed for patients insured by federally funded health insurance programs, including Medicare, Medicaid, and CHAMPUS/TRICARE.  Had the United States known that the bills presented by Defendant, or that Defendant caused to be presented, were false or fraudulent, payment would not have been made for such claims.

262.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the United States to suffer damages.

263.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1) and (3).

## COUNT 3:
## VIOLATION OF THE FEDERAL FALSE CLAIMS ACT,
## 31 U.S.C. § 3729(a)(1)(G)

### Failure To Return Overpayments to the Government

264.   Relator realleges and incorporates by reference the allegations of the

foregoing paragraphs as though fully set forth herein.

265.   This is a civil action brought by Relator on behalf of the United States

against Defendant under the Federal False Claims Act, 31 U.S.C. §§ 3729-3733.

266.   Under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended on

May 20, 2009, Defendant has violated 31 U.S.C. § 3729(a)(1)(G) by knowingly

making, using, or causing to be made or used, a false record or statement material

to an obligation to pay or transmit money or property to the government, or

knowingly concealing or knowingly and improperly avoiding or decreasing an

obligation to pay or transmit money or property to the government.  The term

"obligation" means:

> an established duty, whether or not fixed, arising from an express or
> implied contractual, grantor-grantee, or licensor-licensee relationship,
> from a fee-based or similar relationship, from statute or regulation, or
> from the retention of any overpayment. . . .

31 U.S.C. § 3729(b)(3).

267.   Further, in the health care context, such as Medicaid, the term

"obligation" is further defined as "[a]ny overpayment retained by a person after the

deadline for reporting and returning the overpayment . . . is an obligation (as

107

defined [in the Federal FCA])," and an overpayment must be reported "[b]y the later of . . . 60 days after the date on which the overpayment was identified . . . or the date any corresponding cost report is due, if applicable." Patient Protection and Affordable Care Act, Pub. L. 111-148, § 6402(d)(2), (3), 124 Stat. 119, 755 (codified at 42 U.S.C. § 1128J(d)).

268. Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above.

269. These false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to CMS or its agents, or other Government Health Care Programs.

270. Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

271. Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to CMS or its agents, or other Government Health Care Programs.

272. Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to CMS or its agents, or other Government Health Care Programs.

273. Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by violations of the Anti-Kickback Act, and otherwise not properly reimbursable.

274. Defendant's knowing or intentional concealment or failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the United States.

275. Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the United States to suffer damages.

276. Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1) and (3).

## COUNT 4:
## VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT

### Cal. Gov't. Code § 12650 *et seq.*

277.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

278.   This count sets forth claims for treble damages and forfeitures under the California False Claims Act (the "California FCA").

279.   Defendant violated the California FCA in the following ways:

a.   Cal. Gov't. Code § 12651(a)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

b.   Cal. Gov't. Code § 12651(a)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these false records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agents; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c.   Cal. Gov't. Code § 12651(a)(7):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to,

110

or intended to conceal, avoid, or decrease, an obligation to pay or

transmit money or property to the State or its agents – including an

obligation to repay money or property ABH or its clients had

previously improperly received from the State; and Defendant

knew, or was deliberately ignorant or reckless in not knowing, that

these records or statements were false. Defendant concealed or

improperly avoided or decreased an obligation to pay or transmit

money or property to the State or its agents; and Defendant knew,

or was deliberately ignorant or reckless in not knowing, that its

conduct concealed or improperly avoided or decreased an

obligation to pay or transmit money or property to the State or its

agents.

280.  The State of California, unaware of the fraudulent conduct and the

falsity of the claims, approved, paid, and participated in payments made by the

State, including the California Medicaid Program, or the State's agent for claims

that otherwise would not have been allowed.

281.  Through the acts described above, Defendant intentionally or

knowingly failed to remit funds, or intentionally or knowingly caused its

Dermagraft clients to fail to remit funds, improperly paid by Government Payors.

Defendant intentionally and improperly caused medical providers to charge

111

Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

282. Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

283. Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of California to suffer damages.

284. Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the California FCA, including Cal. Gov't. Code § 12651.

**COUNT 5:**
**VIOLATION OF THE COLORADO MEDICAID FALSE CLAIMS ACT**

**Colo. Rev. Stat. § 25.5-4-303.5 *et seq.***

285. Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

286. This count sets forth claims for treble damages and forfeitures under the Colorado Medicaid False Claims Act (the "Colorado FCA").

112

287.  Defendant violated the Colorado FCA in the following ways:

    a.  Colo. Rev. Stat. § 25.5-4-305(1)(a):  Defendant presented, or
caused to be presented, false or fraudulent claims for payment or
approval to the State or its agent; and Defendant knew, or was
deliberately ignorant or reckless in not knowing, that these claims
were false.

    b.  Colo. Rev. Stat. § 25.5-4-305(b):  Defendant made, used, or caused
to be made or used false or fraudulent records or statements; these
records or statements were material to, or intended to induce the
payment of, false or fraudulent claims made to the State or its
agent; Defendant knew, or was deliberately ignorant or reckless in
not knowing, that these records or statements were false.

    c.  Colo. Rev. Stat. § 25.5-4-305(1)(f):  Defendant made, used, or
caused to be made or used false or fraudulent records or
statements, as alleged above; these false records or statements were
material to, or intended to conceal, avoid, or decrease, an
obligation to pay or transmit money or property in connection with
the Colorado Medical Assistance Act – including an obligation to
repay money or property ABH or its clients had previously
improperly received in connection with the Colorado Medical

113

Assistance Act; and Defendant knew, or was deliberately ignorant

or reckless in not knowing, that these records or statements were

false.  Defendant concealed or improperly avoided or decreased an

obligation to pay or transmit money or property to the State in

connection with the Colorado Medical Assistance Act; and

Defendant knew, or was deliberately ignorant or reckless in not

knowing, that its conduct concealed or improperly avoided or

decreased an obligation to pay or transmit money or property to the

State in connection with the Colorado Medical Assistance Act.

288.   The State of Colorado, unaware of the fraudulent conduct and falsity

of these claims, approved, paid, and participated in payments made in connection

with the Colorado Medical Assistance Act for claims that otherwise would not

have been allowed.

289.   Through the acts described above, Defendant intentionally or

knowingly failed to remit funds, or intentionally or knowingly caused its

Dermagraft clients to fail to remit funds, improperly paid by the State in

connection with the Colorado Medical Assistance Act.  Defendant intentionally and

improperly caused medical providers to charge Government Payors for products

and/or procedures that were not reasonable or medically necessary, that were in

some instances tainted by kickbacks, and otherwise not properly reimbursable.

114

290.    Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors in connection with the Colorado Medical Assistance Act for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

291.    Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Colorado to suffer damages.

292.    Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Colorado FCA, including Colo. Rev. Stat. §§ 25.5-4-305 and 25.5-4-306.

## COUNT 6:
## VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT

### Conn. Gen. Stat. § 17b-301 *et seq.*

293.    Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

294.    This count sets forth claims for treble damages and forfeitures under the Connecticut False Claims Act (the "Connecticut FCA").

295.    Defendant violated the Connecticut FCA in the following ways:

115

a. Conn. Gen. Stat. § 17b-301b(a)(1):  Defendant presented, or
caused to be presented, false or fraudulent claims for payment or
approval under a medical assistance program administered by the
Department of Social Services, or its agent; and Defendant knew,
or was deliberately ignorant or reckless in not knowing, that these
claims were false.

b. Conn. Gen. Stat. § 17b-301b(a)(2):  Defendant made, used, or
caused to be made or used false or fraudulent records or
statements; these records or statements were material to, or
intended to induce the payment of, false or fraudulent claims under
a medical assistance program administered by the Department of
Social Services, or its agent; Defendant knew, or was deliberately
ignorant or reckless in not knowing, that these records or
statements were false.

c. Conn. Gen. Stat. § 17b-301b(a)(7):  Defendant made, used, or
caused to be made or used false or fraudulent records or
statements, as alleged above; these false records or statements were
material to, or intended to conceal, avoid, or decrease, an
obligation to pay or transmit money or property to the State under
a medical assistance program administered by the Department of

116

Social Services, or its agent – including an obligation to repay money or property ABH or its clients had previously improperly received under a medical assistance program administered by the Department of Social Services; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

d. Conn. Gen. Stat. § 17b-301b(a)(8): Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State under a medical assistance program administered by the Department of Social Services, or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State under a medical assistance program administered by the Department of Social Services, or its agent.

296.   The State of Connecticut, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made under a medical assistance program administered by the Department of Social Services or its agent for claims that otherwise would not have been allowed.

297. Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid under a medical assistance program administered by the Department of Social Services or its agent. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

298. Defendant's knowing or intentional concealment and failure to report funds that were improperly received under a medical assistance program administered by the Department of Social Services for services that were not reasonable and medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

299. Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Connecticut to suffer damages.

300. Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under Connecticut FCA, including Conn. Gen. Stat. §§ 17b-301b and 17b-301f.

118

## COUNT 7:
## VIOLATION OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT

### Del. Code Ann. tit. 6, § 1201 *et seq.*

301.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

302.   This count sets forth claims for treble damages and forfeitures under the Delaware False Claims and Reporting Act (the "Delaware FCA").

303.   Defendant violated the Delaware FCA in the following ways:

   a.   Del. Code Ann. tit. 6, § 1201(a)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

   b.   Del. Code Ann. tit. 6, § 1201(a)(2):  Defendant made, used, or caused to be made or used, false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

119

    c. Del. Code Ann. tit. 6,  § 1201(a)(7):  Defendant made, used, or
caused to be made or used false or fraudulent records or
statements, as alleged above; these false records or statements were
material to, or intended to conceal, avoid, or decrease, an
obligation to pay or transmit money or property to the State or its
agents – including an obligation to repay money or property ABH
or its clients had previously improperly received from the State;
and Defendant knew, or was deliberately ignorant or reckless in
not knowing, that these records or statements were false.
Defendant concealed or improperly avoided or decreased an
obligation to pay or transmit money or property to the State or its
agents; and Defendant knew, or was deliberately ignorant or
reckless in not knowing, that its conduct concealed or improperly
avoided or decreased an obligation to pay or transmit money or
property to the State or its agents.

304. The State of Delaware, unaware of the fraudulent course of conduct
and the falsity of these claims, approved, paid, and participated in payments made
by the State, including the State of Delaware Medicaid Program, or the State's
agent for claims that otherwise would not have been allowed.

305. Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

306. Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

307. Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Delaware to suffer damages.

308. Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Delaware FCA, including Del. Code Ann. tit. 6, §§ 1201 and 1205.

121

## COUNT 8:
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

### Fla. Stat. § 68.081 *et seq.*

309.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

310.   This count sets forth claims for treble damages and forfeitures under the Florida False Claims Act (the "Florida FCA").

311.   Defendant violated the Florida FCA in the following ways:

   a. Fla. Stat. § 68.082(2)(a):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

   b. Fla. Stat. § 68.082(2)(b):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

   c. Fla. Stat. § 68.082(2)(g):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or

122

130

intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agents – including an obligation to repay money or property ABH or its clients had previously improperly received from the State; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.  Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents.

312.   The State of Florida, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Florida Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

313.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge

123

Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

314.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

315.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Florida to suffer damages.

316.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Florida FCA, including Fla. Stat. §§ 68.082(2), 68.085, and 68.086.

**COUNT 9:**
**VIOLATION OF THE GEORGIA TAXPAYER PROTECTION FALSE CLAIMS ACT**

**Ga. Code Ann. § 23-3-121 *et seq.***

317.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

124

318.   This count sets forth claims for treble damages and forfeitures under the Georgia Taxpayer Protection False Claims Act (the "Georgia FCA") (prior to July 1, 2012, the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-186 *et seq.*).

319.   Defendant knowingly violated:

a.   Ga. Code Ann. § 23-3-121(a)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or a local government, or their agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

b.   Ga. Code Ann. § 23-3-121(a)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or a local government, or their agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c.   Ga. Code Ann. § 23-3-121(a)(7):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to,

or intended to conceal, avoid, or decrease, an obligation to pay or

transmit money or property to the State or a local government, or

their agent – including an obligation to repay money or property

ABH or its clients had previously improperly received from the

State or a local government, or their agent; and Defendant knew, or

was deliberately ignorant or reckless in not knowing, that these

records or statements were false.  Defendant concealed or

improperly avoided or decreased an obligation to pay or transmit

money or property to the State or a local government, or their

agent; and Defendant knew, or was deliberately ignorant or

reckless in not knowing, that its conduct concealed or improperly

avoided or decreased an obligation to pay or transmit money or

property to the State or a local government, or their agent.

320.   The State of Georgia, unaware of the fraudulent course of conduct and

the falsity of these claims, approved, paid, and participated in payments made by

the State or a local government, including the State of Georgia Medicaid Program,

or the State's agent for claims that otherwise would not have been allowed.

321.   Through the acts described above, Defendant intentionally or

knowingly failed to remit funds, or intentionally or knowingly caused its

Dermagraft clients to fail to remit funds, improperly paid by Government Payors.

126

Defendant intentionally and improperly caused medical providers to charge

Government Payors for products and/or procedures that were not reasonable or

medically necessary, that were in some instances tainted by kickbacks, and

otherwise not properly reimbursable.

322.  Defendant's knowing or intentional concealment and failure to report

funds that were improperly received from Government Payors for services that

were not reasonable or medically necessary and tainted by kickbacks and otherwise

not properly reimbursable constitute an unlawful avoidance or decrease of an

obligation to pay money owed to the State.

323.  Defendant's unlawful conduct occurred from on or around February

15, 2007, until on or around January 16, 2014, and has caused the State of Georgia

to suffer damages.

324.  Accordingly, Defendant is liable for treble damages, civil penalties,

and the cost of this action under the Georgia FAC, including Ga. Code Ann. § 23-

3-121.

## COUNT 10:
## VIOLATION OF THE HAWAII FALSE CLAIMS ACT

### Haw. Rev. Stat. § 661-21 *et seq.*

325.  Relator realleges and incorporates by reference the allegations of the

foregoing paragraphs as though fully set forth herein.

127

326.  This count sets forth claims for treble damages and forfeitures under the Hawaii False Claims Act (the "Hawaii FCA").

327.  Through the acts described above, Defendant knowingly presented or caused to be presented to the Hawaii Medicaid Program fraudulent claims, records, and statements in order to obtain reimbursement.

328.  Defendant violated the Hawaii FCA in the following ways:

a.  Haw. Rev. Stat. § 661-21(a)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

b.  Haw. Rev. Stat. § 661-21(a)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c.  Haw. Rev. Stat. § 661-21(a)(6):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or

128

136

transmit money or property to the State or its agents – including an

obligation to repay money or property ABH or its clients had

previously improperly received from the State; and Defendant

knew, or was deliberately ignorant or reckless in not knowing, that

these records or statements were false.  Defendant concealed or

improperly avoided or decreased an obligation to pay or transmit

money or property to the State or its agents; and Defendant knew,

or was deliberately ignorant or reckless in not knowing, that its

conduct concealed or improperly avoided or decreased an

obligation to pay or transmit money or property to the State or its

agents.

329.   The State of Hawaii, unaware of the fraudulent course of conduct and

the falsity of these claims, approved, paid, and participated in payments made by

the State, including the State of Hawaii Medicaid Program, or the State's agent for

claims that otherwise would not have been allowed.

330.   Through the acts described above, Defendant intentionally or

knowingly failed to remit funds, or intentionally or knowingly caused its

Dermagraft clients to fail to remit funds, improperly paid by Government Payors.

Defendant intentionally and improperly caused medical providers to charge

Government Payors for products and/or procedures that were not reasonable or

medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

331.    Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

332.    Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Hawaii to suffer damages.

333.    Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Hawaii FCA, including Haw. Rev. Stat. §§ 661-21 and 661-27.

### COUNT 11:
### VIOLATION OF THE ILLINOIS FALSE CLAIMS ACT

### 740 Ill. Comp. Stat. § 175/1 *et seq.*

334.    Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

335.    This count sets forth claims for treble damages and forfeitures under the Illinois False Claims Act (the "Illinois FCA").

336.    Defendant violated the Illinois FCA in the following ways:

130

a. 740 Ill. Comp. Stat. § 175/3(a)(1)(A):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

b. 740 Ill. Comp. Stat. § 175/3(a)(1)(B):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c. 740 Ill. Comp. Stat. § 175/3(a)(1)(G):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agents – including an obligation to repay money or property ABH or its clients had previously improperly received from the State; and Defendant knew, or was deliberately ignorant or reckless in

131

not knowing, that these records or statements were false. Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents.

337.   The State of Illinois, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State, including the State of Illinois Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

338.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

339.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that

were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

340.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Illinois to suffer damages.

341.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Illinois FCA, including 740 Ill. Comp. Stat. §§ 175/3 and 175/4.

**COUNT 12:**
**VIOLATION OF THE INDIANA FALSE CLAIMS**
**AND WHISTLEBLOWER PROTECTION ACT**

**Ind. Code § 5-11-5.5-1 *et seq.***

342.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

343.   This count sets forth claims for treble damages and forfeitures under the Indiana False Claims and Whistleblower Protection Act (the "Indiana FCA").

344.   Defendant violated the Indiana FCA in the following ways:

   a. Ind. Code § 5-11-5.5-2(b)(1):  Defendant presented false claims to the State or its agent for payment or approval; Defendant knew,

133

was deliberately ignorant or reckless in not knowing, or intended that these claims were false.

b.  Ind. Code § 5-11-5.5-2(b)(2):  Defendant made or used false records or statements; these false records or statements were made to obtain payment or approval of a false claim from the State or its agent; Defendant knew, was deliberately ignorant or reckless in not knowing, or intended that these records or statements were false; and Defendant intended they would be used to obtain payment or approval of a false claim from the State or its agent.

c.  Ind. Code § 5-11-5.5-2(b)(6):  Defendant made or used false records or statements to avoid an obligation to pay or transmit property to the State or its agent; Defendant, was deliberately ignorant or reckless in not knowing, or intended that the records or statements were false; and Defendant knew intended that these false records or statements would be made or used to avoid an obligation to pay or transmit property to the State or its agent.

345.    The State of Indiana, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Indiana Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

346.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

347.   Defendant's knowing and intentional conduct constitutes an unlawful avoidance or decrease of an obligation to pay money owed to the State.

348.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Indiana to suffer damages.

349.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Indiana FCA, including Ind. Code §§ 5-11-5.5-2 and 5-11-5.5-6.

## COUNT 13:
## VIOLATION OF THE IOWA FALSE CLAIMS ACT

### Iowa Code § 685.1 *et seq.*

350.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

351.   This count sets forth claims for treble damages and forfeitures under the Iowa False Claims Act (the "Iowa FCA").

352.   Defendant violated the Iowa FCA in the following ways:

    a.   Iowa Code § 685.2(1)(a):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false

    b.   Iowa Code § 685.2(1)(b):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

    c.   Iowa Code § 685.2(1)(g):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agents – including an obligation to repay money or property ABH or its clients had previously improperly received from the State; and Defendant

knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents.

353. The State of Iowa, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State, including the State of Iowa Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

354. Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

355.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

356.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Iowa to suffer damages.

357.   Accordingly, Defendant is liable for treble damages, civil penalties, and the costs of this action under Iowa FCA, including Iowa Code §§ 685.2 and 685.3.

## COUNT 14:
## VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW

**La. Rev. Stat. § 46:438.1** *et seq.*

358.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

359.   This count sets forth claims for treble damages and forfeitures under the Louisiana Medical Assistance Programs Integrity Law (the "Louisiana FCA").

360.   Defendant violated the FCA in the following ways:

138

a. La. Rev. Stat. § 46:438.3(A): Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

b. La. Rev. Stat. § 46:438.3(B): Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c. La. Rev. Stat. § 46:438.3(C): Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the medical assistance programs – including an obligation to repay money or property ABH or its clients had previously improperly received from the medical assistance programs; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendant concealed or improperly avoided

139

or decreased an obligation to pay or transmit money or property to

the medical assistance programs; and Defendant knew, or was

deliberately ignorant or reckless in not knowing, that its conduct

concealed or improperly avoided or decreased an obligation to pay

or transmit money or property to the medical assistance programs.

361. Moreover, the Louisiana False Claims Act, La. Rev. Stat.

§ 46:438.2A, specifically provides that:

> No person shall solicit, receive, offer or pay any remuneration,
> including but not limited to kickbacks, bribes, rebates, or . . .
> payments, directly or indirectly, overtly or covertly, in cash or in kind,
> for the following:
>
> (1)    In return for referring an individual to a health care provider, ...
> for the furnishing or arranging to furnish any good, supply, or service
> for which payment may be made, in whole or in part, under the
> medical assistance programs.
>
> (2) In return for purchasing, leasing, or ordering, or for arranging for
> or recommending purchasing, leasing, or ordering, any good, supply,
> or service, or facility for which payment may be made, in whole or in
> part, under the medical assistance programs.
>
> (3) To a recipient of goods, services, or supplies, or his representative,
> for which payment may be made, in whole or in part, under the
> medical assistance programs.

362. The State of Louisiana, unaware of the fraudulent course of conduct

and the falsity of these claims, approved, paid, and participated in payments made

by the State, including the State of Louisiana Medicaid Program, or the State's

agent for claims that otherwise would not have been allowed.

363. Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

364. Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

365. Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Louisiana to suffer damages.

366. Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Louisiana FCA, including La. Rev. Stat. § 46.438.6.

## COUNT 15:
## VIOLATION OF THE MARYLAND FALSE HEALTH CLAIMS ACT

### Md. Code Ann., Health-Gen. § 2-601 *et seq.*

367.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

368.   This count sets forth claims for treble damages and forfeitures under the Maryland False Health Claims Act (the "Maryland FCA").

369.   Defendant violated the Maryland FCA in the following ways:

a.   Md. Code Ann., Health-Gen. § 2-602(a)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

b.   Md. Code Ann., Health-Gen. § 2-602(a)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

142

    c. Md. Code Ann., Health-Gen. § 2-602(a)(7): Defendant made,
used, or caused to be made or used false or fraudulent records or
statements, as alleged above; these false records or statements were
material to, or intended to conceal, avoid, or decrease, an
obligation to pay or transmit money or property to the State or its
agents – including an obligation to repay money or property ABH
or its clients had previously improperly received from the State;
and Defendant knew, or was deliberately ignorant or reckless in
not knowing, that these records or statements were false.

    d. Md. Code Ann., Health-Gen. § 2-602(a)(8): Defendant concealed
or improperly avoided or decreased an obligation to pay or
transmit money or property to the State or its agents; and
Defendant knew, or was deliberately ignorant or reckless in not
knowing, that its conduct concealed or improperly avoided or
decreased an obligation to pay or transmit money or property to the
State or its agents.

    370. The State of Maryland, unaware of the fraudulent course of conduct
and the falsity of these claims, approved, paid, and participated in payments made
by the State, including the State of Maryland Medicaid Program, or the State's
agent for claims that otherwise would not have been allowed.

143

371.  Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

372.  Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

373.  Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Maryland to suffer damages.

374.  Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Maryland FCA, including Md. Code Ann., Health-Gen. §§ 2-602 and 2-604.

## COUNT 16:
## VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT

### Mass. Gen. Laws ch. 12, § 5 *et seq.*

375.    Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

376.    This count sets forth claims for treble damages and forfeitures under the Massachusetts False Claims act (the "Massachusetts FCA").

377.    Defendant knowingly violated:

    a.  Mass. Gen. Laws ch. 12, § 5B(a)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the Commonwealth or a political subdivision thereof, or their agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

    b.  Mass. Gen. Laws ch. 12, § 5B(a)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the Commonwealth or a political subdivision thereof, or their agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

145

    c. Mass. Gen. Laws ch. 12, § 5B(a)(9): Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the Commonwealth or a political subdivision thereof, or their agent – including an obligation to repay money or property ABH or its clients had previously improperly received from the Commonwealth or a political subdivision thereof, or their agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth or a political subdivision thereof, or their agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth or a political subdivision thereof, or their agent.

378.   The Commonwealth of Massachusetts, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated

in payments made by the Commonwealth or a political subdivision thereof, including the Commonwealth of Massachusetts Medicaid Program, or the Commonwealth's agent for claims that otherwise would not have been allowed.

379.  Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

380.  Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the Commonwealth or a political subdivision thereof, or their agent.

381.  Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the Commonwealth of Massachusetts to suffer damages.

382. Accordingly, Defendant is liable for treble damages, consequential damages, civil penalties, and the cost of this action under the Massachusetts FCA, including Mass. Gen. Laws ch. 12, §§ 5B, 5F, and 5H.

## COUNT 17:
## VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT

### Mich. Comp. Laws § 400.601 *et seq.*

383. Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

384. This count sets forth claims for treble damages and forfeitures under the Michigan Medicaid False Claim Act (the "Michigan FCA").

385. Defendant violated the Michigan FCA in the following ways:

a. Mich. Comp. Laws § 400.607, § 7(1): Defendant made, presented, or caused to be made or presented to an officer or employee of the State or its agent claims under the social welfare act; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

b. Mich. Comp. Laws § 400.607, § 7(2): Defendant made, presented, or caused to be made or presented claims under the social welfare act; Defendant knew, or was deliberately ignorant or reckless in not knowing, that the claims falsely represented that the goods or

148

services for which the claims were made were not medically

necessary in accordance with professionally accepted standards.

c. Mich. Comp. Laws § 400.607, § 7(3):  Defendant made, used, or

caused to be made or used false records or statements, as alleged

above; these false statements were intended to conceal, avoid, or

decrease an obligation to pay or transmit money or property to the

state or its agents pertaining to claims under the social welfare act.

386.   The State of Michigan, unaware of the fraudulent course of conduct

and the falsity of these claims, approved, paid, and participated in payments made

by the State, including the State of Michigan Medicaid Program, or the State's

agent for claims that otherwise would not have been allowed.

387.   Through the acts described above, Defendant intentionally or

knowingly failed to remit funds, or intentionally or knowingly caused its

Dermagraft clients to fail to remit funds, improperly paid by Government Payors.

Defendant intentionally and improperly caused medical providers to charge

Government Payors for products and/or procedures that were not reasonable or

medically necessary, that were in some instances tainted by kickbacks, and

otherwise not properly reimbursable.

388.   Defendant's knowing or intentional concealment and failure to report

funds that were improperly received from Government Payors for services that

were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

389. Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Michigan to suffer damages.

390. Accordingly, Defendant is liable for damages, penalties, and costs under the Michigan FCA, including Mich. Comp. Laws §§ 400.610a and 400.612.

## COUNT 18:
## VIOLATION OF THE MINNESOTA FALSE CLAIMS ACT
### Minn. Stat. § 15C.01 *et seq.*

391. Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

392. This count sets forth claims for treble damages and forfeitures under the Minnesota False Claims Act (the "Minnesota FCA").

393. Defendant violated the Minnesota FCA in the following ways:

a. Minn. Stat. § 15C.02(a)(1): Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

150

b. Minn. Stat. § 15C.02(a)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c. Minn. Stat. § 15C.02(a)(7):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or a political subdivision, or their agents – including an obligation to repay money or property ABH or its clients had previously improperly received from the State or a political subdivision, or their agents; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.  Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or a political subdivision, or their agents; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct

151

> concealed or improperly avoided or decreased an obligation to pay
>
> or transmit money or property to the State or a political
>
> subdivision, or their agents.

394.   The State of Minnesota, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Minnesota Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

395.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

396.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

397.   Defendant's unlawful conduct occurred from on or around February

15, 2007, until on or around January 16, 2014, and has caused the State of

Minnesota to suffer damages.

398.   Accordingly, Defendant is liable for treble damages, civil penalties,

and the cost of this action under the Minnesota FCA, including Minn. Stat.

§§ 15C.02 and 15C.12.

## COUNT 19:
## VIOLATION OF THE MONTANA FALSE CLAIMS ACT

### Mont. Code Ann. § 17-8-401 *et seq.*

399.   Relator realleges and incorporates by reference the allegations of the

foregoing paragraphs as though fully set forth herein.

400.   This count sets forth claims for treble damages and forfeitures under

the Montana False Claims Act (the "Montana FCA").

401.   Defendant violated the Montana FCA in the following ways:

   a.  Mont. Code Ann. § 17-8-403(1)(a):  Defendant presented, or

       caused to be presented, false or fraudulent claims for payment or

       approval to the State or its agent; and Defendant knew, or was

       deliberately ignorant or reckless in not knowing, that these claims

       were false.

   b.  Mont. Code Ann. § 17-8-403(1)(b):  Defendant made, used, or

       caused to be made or used false or fraudulent records or

153

statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c.  Mont. Code Ann. § 17-8-403(1)(g):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to a governmental entity – including an obligation to repay money or property ABH or its clients had previously improperly received from a governmental entity; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.  Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to a governmental entity; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to a governmental entity.

154

402.   The State of Montana, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including State of Montana Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

403.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

404.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

405.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Montana to suffer damages.

155

406. Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Montana FCA, including Mont. Code Ann. §§ 17-8-403 and 17-8-411.

## COUNT 20:
## VIOLATION OF THE NEVADA FALSE CLAIMS ACT

### Nev. Rev. Stat. § 357.010 *et seq.*

407. Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

408. This count sets forth claims for treble damages and forfeitures under the Nevada False Claims Act (the "Nevada FCA").

409. Defendant violated the Nevada FCA in the following ways:

    a. Nev. Rev. Stat. § 357.040(1)(a): Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

    b. Nev. Rev. Stat. § 357.040(1)(b): Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

    c. Nev. Rev. Stat. § 357.040(1)(f):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agents – including an obligation to repay money or property ABH or its clients had previously improperly received from the State; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

    d. Nev. Rev. Stat. § 357.040(1)(g):  Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents.

410.  The State of Nevada, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including, State of Nevada Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

157

411.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

412.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

413.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Nevada to suffer damages.

414.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Nevada FCA, including Nev. Rev. Stat. § 357.040.

158

## COUNT 21:
## VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT

### N.J. Stat. Ann. § 2A:32C-1 *et seq.*

415.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

416.   This count sets forth claims for treble damages and forfeitures under the New Jersey False Claims Act (the "New Jersey FCA").

417.   Defendant violated the New Jersey FCA:

   a. N.J. Stat. Ann. § 2A:32C-3(a):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

   b. N.J. Stat. Ann. § 2A:32C-3(b):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were intended to induce the payment of false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

159

      c.  N.J. Stat. Ann. § 2A:32C-3(g):  Defendant made, used, or caused

to be made or used false records or statements; Defendant knew, or

was deliberately ignorant or reckless in not knowing, that the

records or statements were false; Defendant intended that the false

records or statements would conceal, avoid, or decrease an

obligation to pay or transmit money or property to the State or its

agent.

418.  The State of New Jersey, unaware of the fraudulent course of conduct

and the falsity of these claims, approved, paid, and participated in payments made

by the State, including the State of New Jersey Medicaid Program, or the State's

agent for claims that otherwise would not have been allowed.

419.  Through the acts described above, Defendant intentionally or

knowingly failed to remit funds, or intentionally or knowingly caused its

Dermagraft clients to fail to remit funds, improperly paid by Government Payors.

Defendant intentionally and improperly caused medical providers to charge

Government Payors for products and/or procedures that were not reasonable or

medically necessary, that were in some instances tainted by kickbacks, and

otherwise not properly reimbursable.

420.  Defendant's knowing or intentional concealment and failure to report

funds that were improperly received from Government Payors for services that

were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

421.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of New Jersey to suffer damages.

422.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the New Jersey FCA, including N.J. Stat. Ann. §§ 2A:32C-3 and 2A:32C-8.

**COUNT 22:**
**VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT**

**N.M. Stat. Ann. § 27-14-1 *et seq.***

423.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

424.   This count sets forth claims for treble damages and forfeitures under the New Mexico Medicaid False Claims Act (the "New Mexico FCA").

425.   Defendant violated the New Mexico FCA in the following ways:

   a. N.M. Stat. Ann. § 27-14-4(A):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval under the medicaid program to the State or its agent; and

161

Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

b. N.M. Stat. Ann. § 27-14-4(C):  Defendant made, used, or caused to be made or used false records or statements; these false records or statements were made to obtain payment or approval of a false or fraudulent claim from the State or its agent under the medicaid program; Defendant knew, was deliberately ignorant or reckless in not knowing, or intended that these records or statements were false; and Defendant intended they would be used to obtain payment or approval of a false claim from the State or its agent under the medicaid program.

c. N.M. Stat. Ann. § 27-14-4(E):  Defendant made, used, or caused to be made or used false records or statements; Defendant knew, or was deliberately ignorant or reckless in not knowing, that the records or statements were false; Defendant intended that the false records or statements would conceal, avoid, or decrease an obligation to pay or transmit money or property to the State or its agent relative to the medicaid program.

426.   The State of New Mexico, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in

payments made by the State, including the State of New Mexico Medicaid
Program, or the State's agent for claims that otherwise would not have been
allowed.

427.   Through the acts described above, Defendant intentionally or
knowingly failed to remit funds, or intentionally or knowingly caused its
Dermagraft clients to fail to remit funds, improperly paid by Government Payors.
Defendant intentionally and improperly caused medical providers to charge
Government Payors for products and/or procedures that were not reasonable or
medically necessary, that were in some instances tainted by kickbacks, and
otherwise not properly reimbursable.

428.   Defendant's knowing or intentional concealment and failure to report
funds that were improperly received from Government Payors for services that
were not reasonable or medically necessary and tainted by kickbacks and otherwise
not properly reimbursable constitute an unlawful avoidance or decrease of an
obligation to pay money owed to the State.

429.   Defendant's unlawful conduct occurred from on or around February
15, 2007, until on or around January 16, 2014, and has caused the State of New
Mexico to suffer damages.

430. Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the New Mexico FCA, including N.M. Stat. Ann. §§ 27-14-4 and 27-14-9.

## COUNT 23:
## VIOLATION OF THE NEW YORK FALSE CLAIMS ACT

### N.Y. St. Fin. Law § 187 *et seq.*

431. Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

432. This count sets forth claims for treble damages and forfeitures under the New York False Claims Act (the "New York FCA").

433. Defendant violated the New York FCA in the following ways:

  a. N.Y. St. Fin. Law § 189(1)(a): Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

  b. N.Y. St. Fin. Law § 189(1)(b): Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

164

c. N.Y. St. Fin. Law § 189(1)(f): Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or a local government, or their agents – including an obligation to repay money or property ABH or its clients had previously improperly received from the State or a local government, or their agents; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

d. N.Y. St. Fin. Law § 189(1)(g): Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or a local government, or their agents; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or a local government, or their agents.

434. The State of New York, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made

165

by the State or a local government, including the State of New York Medicaid Program, or their agent for claims that otherwise would not have been allowed.

435.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

436.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

437.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of New York to suffer damages.

438.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the New York FCA, including N.Y. St. Fin. Law §§ 189 and 190.

## COUNT 24:
## VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT

### N.C. Gen. Stat. § 1-605 *et seq.*

439.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

440.   This count sets forth claims for treble damages and forfeitures under the North Carolina False Claims Act (the "North Carolina FCA").

441.   Defendant violated the North Carolina FCA in the following ways:

   a.   N.C. Gen. Stat. § 1-607(a)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

   b.   N.C. Gen. Stat. § 1-607(a)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

   c.   N.C. Gen. Stat. § 1-607(a)(7):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to,

167

175

or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agents – including an obligation to repay money or property ABH or its clients had previously improperly received from the State; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents.

442.   The State of North Carolina, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of North Carolina Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

443.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors.

Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

444.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

445.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of North Carolina to suffer damages.

446.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the North Carolina FCA, including N.C. Gen. Stat. §§ 1-607 and 1-610.

## COUNT 25:
## VIOLATION OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT

### Okla. Stat. tit. 63, § 5053 *et seq.*

447.   Relator realleges and incorporates by reference the allegations of foregoing paragraphs as though fully set forth herein.

169

448.   This count sets forth claims for treble damages and forfeitures under the Oklahoma Medicaid False Claims Act (the "Oklahoma FCA").

449.   Defendant violated the Oklahoma FCA:

    a.   Okla. Stat. tit. 63, § 5053.1(B)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

    b.   Okla. Stat. tit. 63, § 5053.1(B)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were intended to induce the payment of false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

    c.   Okla. Stat. tit. 63, § 5053.1(B)(7):  Defendant made, used, or caused to be made or used false records or statements; Defendant knew, or was deliberately ignorant or reckless in not knowing, that the records or statements were false; Defendant intended that the false records or statements would conceal, avoid, or decrease an

170

obligation to pay or transmit money or property to the State or its agent.

450.   The State of Oklahoma, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Oklahoma Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

451.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

452.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

453.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Oklahoma to suffer damages.

454.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Oklahoma FCA, including Okla. Stat. tit. 63, §§ 5053.1 and 5053.4.

## COUNT 26:
## VIOLATION OF THE RHODE ISLAND STATE FALSE CLAIMS ACT
### R.I. Gen. Laws § 9-1.1-1 *et seq.*

455.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

456.   This count sets forth claims for treble damages and forfeitures under the Rhode Island State False Claims Act (the "Rhode Island FCA").

457.   Defendant violated the Rhode Island FCA:

   a.   R.I. Gen. Laws § 9-1.1-3(a)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

   b.   R.I. Gen. Laws § 9-1.1-3(a)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the

payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c. R.I. Gen. Laws § 9-1.1-3(a)(7): Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agents – including an obligation to repay money or property ABH or its clients had previously improperly received from the State; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agents.

458. The State of Rhode Island, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in

payments made by the State, including the State of Rhode Island Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

459.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

460.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

461.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Rhode Island to suffer damages.

462.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Rhode Island FCA, including R.I. Gen. Laws §§ 9-1.1-3 and 9-1.1-4.

### COUNT 27:
### VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 71-5-181 *et seq.*

463.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

464.   This count sets forth claims for treble damages and forfeitures under the Tennessee Medicaid False Claims Act (the "Tennessee FCA").

465.   Defendant violated the Tennessee FCA:

   a.  Tenn. Code Ann. § 71-5-182(a)(1)(A):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent under the Medicaid program; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

   b.  Tenn. Code Ann. § 71-5-182(a)(1)(B):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent under the medicaid program; Defendant

175

knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c.  Tenn. Code Ann. § 71-5-182(a)(1)(D):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agent relative to the medicaid program – including an obligation to repay money or property ABH or its clients had previously improperly received from the State relative to the medicaid program; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.  Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agent relative to the medicaid program; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agent relative to the medicaid program.

176

466.   The State of Tennessee, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State, including the State of Tennessee Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

467.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

468.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

469.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Tennessee to suffer damages.

470.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Tennessee FCA, including Tenn. Code Ann. §§ 71-5-182 and 71-5-183.

## COUNT 28:
## VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION ACT

### Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

471.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

472.   This count sets forth claims for treble damages and forfeitures under the Texas Medicaid Fraud Prevention Act (the "Texas FCA").

473.   Defendant violated the Texas FCA:

      a. Tex. Hum. Res. Code Ann. § 36.002(1):  Defendant made or caused to be made false statements or misrepresentations that were material to permit people receive benefits or payments under the Medicaid program that were not authorized or were greater than the benefits or payments that were authorized; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that the false statements or misrepresentations were material to permit people to receive benefits or payments under the Medicaid program that were not authorized or were greater than the benefits or payments that were authorized.

178

b. Tex. Hum. Res. Code Ann. § 36.002(2):  Defendant concealed or failed to disclose information that permitted people to receive benefits or payments under the Medicaid program that were not authorized or that were greater than the benefit that were authorized; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that the concealed information, or the information it failed to disclose, would permit people to receive benefits or payments under the Medicaid program that were not authorized or that were greater than the benefit that were authorized

c. Tex. Hum. Res. Code § 36.002(7)(C):  Defendant made or caused to be made a claim under the Medicaid program for a product that was adulterated, mislabeled, or otherwise inappropriate; Defendant knew, or was deliberately ignorant or reckless in not knowing, that the product was adulterated, mislabeled, or otherwise inappropriate.

d. Tex. Hum. Res. Code § 36.002(12):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to an obligation to pay or transmit money or property to

the State or its agent under the Medicaid program – including an obligation to repay money or property ABH or its clients had previously improperly received from the State; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agent under the Medicaid program; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agent under the Medicaid program.

474.   The State of Texas, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Texas Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

475.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or

medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

476.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

477.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Texas to suffer damages.

478.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Texas FCA, including Hum. Res. Code § 36.007.

## COUNT 29:
## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

### Va. Code Ann. § 8.01-216.1 *et seq.*

479.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

480.   This count sets forth claims for treble damages and forfeitures under the Virginia Fraud Against Taxpayers Act (the "Virginia FCA").

481.   Defendant violated the Virginia FCA:

181

a. Va. Code Ann. § 8.01-216.3(A)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the Commonwealth or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

b. Va. Code Ann. § 8.01-216.3(A)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the Commonwealth or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c. Va. Code. Ann. § 8.01-216.3(A)(7):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the Commonwealth or its agent – including an obligation to repay money or property ABH or its clients had previously improperly received from the Commonwealth; and Defendant knew, or was

182

deliberately ignorant or reckless in not knowing, that these records or statements were false. Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth or its agent.

482.   The Commonwealth of Virginia, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the Commonwealth, including the Commonwealth of Virginia Medicaid Program, or the Commonwealth's agent for claims that otherwise would not have been allowed.

483.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

484.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the Commonwealth.

485.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the Commonwealth of Virginia to suffer damages.

486.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Virginia FCA, including Va. Code. Ann. §§ 8.01-216.3 and 8.01-216.7.

## COUNT 30:
## VIOLATION OF THE WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT

### Wash. Rev. Code § 74.66.005 *et seq.*

487.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

488.   This count sets forth claims for treble damages and forfeitures under the Washington Medicaid Fraud False Claims Act (the "Washington FCA").

489.   Defendant violated the Washington FCA:

184

a. Wash. Rev. Code § 74.66.020(1)(a):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false.

b. Wash. Rev. Code § 74.66.020(1)(b):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the State or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c. Wash. Rev. Code § 74.66.020(1)(g):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the State or its agent – including an obligation to repay money or property ABH or its clients had previously improperly received from the State; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.  Defendant concealed or improperly avoided or decreased an obligation to pay or transmit money or

185

property to the State or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State or its agent.

490.   The State of Washington, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid and participated in payments made by the State, including the State of Washington Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

491.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

492.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

186

493.   Defendant's unlawful conduct occurred from on or around February

15, 2007, until on or around January 16, 2014, and has caused the State of

Washington to suffer damages.

494.   Accordingly, Defendant is liable for treble damages, civil penalties,

and the cost of this action under the Washington FCA, including Wash. Rev. Code

§§ 74.66.020 and 74.66.070.

## COUNT 31:
## VIOLATION OF THE WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE LAW

### Wis. Stat. § 20.931 *et seq.*

495.   Relator realleges and incorporates by reference the allegations of the

foregoing paragraphs as though fully set forth herein.

496.   This count sets forth claims for treble damages and forfeitures under

the Wisconsin False Claims for Medical Assistance Law (the "Wisconsin FCA").

497.   Defendant violated the Wisconsin FCA in the following ways:

a. Wis. Stat. § 20.931(2)(a):  Defendant presented, or caused to be

   presented, false claims for medical assistance to an employee,

   officer or agent of the State; and Defendant knew, or was

   deliberately ignorant or reckless in not knowing, that these claims

   were false.

187

    b.  Wis. Stat. § 20.931(2)(b):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were intended to obtain the approval or payment of false claims for medical assistance; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

    c.  Wis. Stat. § 20.931(2)(g):  Defendant made, used, or caused to be made or used false records or statements; Defendant knew, or was deliberately ignorant or reckless in not knowing, that the records or statements were false; Defendant intended that the false records or statements would conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program.

498.   The State of Wisconsin, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the State, including the State of Wisconsin Medicaid Program, or the State's agent for claims that otherwise would not have been allowed.

499.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge

Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

500.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

501.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the State of Wisconsin to suffer damages.

502.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the Wisconsin FCA, including Wis. Stat. § 20.931.

## COUNT 32:
## VIOLATION OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT

### D.C. Code § 2-381.01 *et seq.*

503.   Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

504.   This count sets forth claims for treble damages and forfeitures under the District of Columbia False Claims Act (the "District of Columbia FCA").

505.   Defendant violated the District of Columbia FCA:

a.  D.C. Code § 2-381.02(a)(1):  Defendant presented, or caused to be presented, false or fraudulent claims for payment or approval to the District or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these claims were false

b.  D.C. Code § 2-381.02(a)(2):  Defendant made, used, or caused to be made or used false or fraudulent records or statements; these records or statements were material to, or intended to induce the payment of, false or fraudulent claims made to the District or its agent; Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.

c.  D.C. Code § 2-381.02(a)(6):  Defendant made, used, or caused to be made or used false or fraudulent records or statements, as alleged above; these false records or statements were material to, or intended to conceal, avoid, or decrease, an obligation to pay or transmit money or property to the District or its agent – including an obligation to repay money or property ABH or its clients had previously improperly received from the District; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that these records or statements were false.  Defendant concealed or improperly avoided or decreased an obligation to pay or transmit

190

money or property to the District or its agent; and Defendant knew, or was deliberately ignorant or reckless in not knowing, that its conduct concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the District or its agent.

506.   The District of Columbia, unaware of the fraudulent course of conduct and the falsity of these claims, approved, paid, and participated in payments made by the District, including the District of Columbia Medicaid Program, or the District's agent for claims that otherwise would not have been allowed.

507.   Through the acts described above, Defendant intentionally or knowingly failed to remit funds, or intentionally or knowingly caused its Dermagraft clients to fail to remit funds, improperly paid by Government Payors. Defendant intentionally and improperly caused medical providers to charge Government Payors for products and/or procedures that were not reasonable or medically necessary, that were in some instances tainted by kickbacks, and otherwise not properly reimbursable.

508.   Defendant's knowing or intentional concealment and failure to report funds that were improperly received from Government Payors for services that were not reasonable or medically necessary and tainted by kickbacks and otherwise

not properly reimbursable constitute an unlawful avoidance or decrease of an obligation to pay money owed to the State.

509.   Defendant's unlawful conduct occurred from on or around February 15, 2007, until on or around January 16, 2014, and has caused the District of Columbia to suffer damages.

510.   Accordingly, Defendant is liable for treble damages, civil penalties, and the cost of this action under the District of Columbia FCA, including D.C. Code § 2-381.02.

## PRAYERS FOR RELIEF

WHEREFORE, Relator Montecalvo, on behalf of the United States and the Plaintiff States, and on his own behalf, requests that this Court enter an order:

a.   That Defendant violated the Federal and State False Claims Acts;

b.   That Defendant pay an amount equal to three times the amount of damages the United States and the Plaintiff States have sustained because of Defendant's actions, plus a civil penalty against Defendant of not less than $5,500 and not more than $11,000 for each violation of the Federal and State False Claims Acts;

c.   That Defendant ceases and desists from violating the Federal and State FCAs;

d.  That Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to the Federal and State FCAs;

e.  That Relator be awarded the maximum amount allowed as a relator share pursuant to 31 U.S.C. § 3730(d) and comparable provisions of the State False Claims Acts; and

f.  That the United States, the Plaintiff States and Relator be granted all such other relief as the Court deems just and proper.

PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS.

February 14, 2014                    Respectfully submitted,

                                    RELATOR ANTONIO S. MONTECALVO

                                    By: _____
                                    Silvija A. Strikis (DC Bar: 470805)
                                    Joseph S. Hall (DC Bar: 475057)
                                    KELLOGG, HUBER, HANSEN, TODD
                                       EVANS & FIGEL, P.L.L.C.
                                    1615 M Street, N.W., Suite 400
                                    Washington, D.C. 20036
                                    (202) 326-7900
                                    (202) 326-7999 (facsimile)

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF INDIANA; STATE OF IOWA; STATE OF LOUISIANA; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF MONTANA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OKLAHOMA; STATE OF RHODE ISLAND; STATE OF TENNESSEE; STATE OF TEXAS; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN; and THE DISTRICT OF COLUMBIA; *ex rel.* ANTONIO S. MONTECALVO, | |
| | **CIVIL ACTION NO.** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| SHIRE REGENERATIVE MEDICINE, INC. F/K/A ADVANCED BIOHEALING, INC., Defendant. | February 14, 2014 |

### FALSE CLAIMS ACT *QUI TAM* COMPLAINT

### SERVICE LIST

Service List

The Honorable Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Ronald C. Machen Jr.
c/o Civil Process Clerk
U.S. Attorney for the District of Columbia
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530

The Honorable Kamala Harris (via Certified Mail)
Attorney General of California
1300 I Street, Suite 1740
Sacramento, CA 95814

The Honorable John W. Suthers (via Certified Mail)
Attorney General of Colorado
ATTENTION: George A. Codding, Assistant Attorney General
                 Office of the Attorney General
                 Colorado Medicaid Fraud Control Unit
                 Civil/Qui Tam Coordinator
                 Ralph L. Carr Judicial Center
                 1300 Broadway, 9th Floor
                 Denver, CO 80203

The Honorable George Jepsen (via Certified Mail)
Attorney General of Connecticut
ATTENTION: Robert B. Teitelman, Assistant Attorney General
                 Connecticut Office of Attorney General
                 55 Elm Street
                 Hartford, CT 06106-1774

The Honorable Joseph R. Biden, III (via Certified Mail)
Attorney General of Delaware
Carvel State Office Building
820 North French Street
Wilmington, DE 19801

The Honorable Irvin Nathan (via Certified Mail)
District of Columbia Attorney General
John A. Wilson Building
1350 Pennsylvania Avenue, N.W., Suite 409
Washington, DC 20009

Jeff Atwater (via Certified Mail)
Chief Financial Officer
Florida Department of Financial Services
200 East Gaines Street
Tallahassee, FL 32399-0300

The Honorable Pam Bondi (via Certified Mail)
Attorney General of Florida
The Capitol, PL 01
Tallahassee, FL 32399

The Honorable Sam Olens (via Certified Mail)
Attorney General of Georgia
40 Capitol Square, S.W.
Atlanta, GA 30334-1300

The Honorable David Louie (via Certified Mail)
Attorney General of Hawaii
425 Queen Street, 10th Floor
Honolulu, HI 96813

The Honorable Lisa Madigan (via Certified Mail)
Attorney General of Illinois
James R. Thompson Center
100 West Randolph Street
Chicago, IL 60601

The Honorable Greg Zoeller (via Certified Mail)
Attorney General of Indiana
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204

David O. Thomas (via Certified Mail)
Inspector General, State of Indiana
315 W. Ohio St. Room 104
Indianapolis, IN 46202

The Honorable Tom Miller (via Certified Mail)
Attorney General of Iowa
Hoover State Office Building
1305 E. Walnut Street
Des Moines, IA 50319

The Honorable James D. Caldwell (via Certified Mail)
Attorney General of Louisiana
1885 North Third Street
Baton Rouge, LA 70802

The Honorable Douglas F. Gansler (via Certified Mail)
Attorney General of Maryland
ATTENTION: Ilene J. Nathan
                     Director, Medicaid Fraud Control Unit
                     Office of the Attorney General
                     200 St. Paul Place
                     Baltimore, MD 21202

The Honorable Bill Schuette (via Certified Mail)
Attorney General of Michigan
525 West Ottawa Street
Lansing, MI 48909-0212

The Honorable Lori Swanson (via Certified Mail)
Attorney General of Minnesota
State Capitol, Suite 102
St. Paul, MN 55155

The Honorable Martha Coakley (via Certified Mail)
Attorney General of Massachusetts
One Ashburton Place
Boston, MA 02108-1698

The Honorable Timothy Fox (via Certified Mail)
Attorney General of Montana
Justice Building, 215 N. Sanders Street
Helena, MT 59620-1401

The Honorable Catherine Cortez Masto (via Certified Mail)
Attorney General of Nevada
Old Supreme Court Building
100 North Carson Street
Carson City, NV 89701

The Honorable John Jay Hoffman (via Certified Mail)
Active Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

Ray Mensack, General Counsel (via Certified Mail)
New Mexico Human Services Department
2009 South Pacheco Street, Ground Floor
Santa Fe, NM 87504

The Honorable Eric Schneiderman (via Certified Mail)
Attorney General of New York
Department of Law – The Capitol, 2nd Floor
Albany, NY 12224

The Honorable Roy Cooper (via Certified Mail)
Attorney General of North Carolina
ATTENTION: Michael M. Berger
                 Assistant Attorney General
                 Medicaid Investigation Division
                 North Carolina Department of Justice
                 5505 Creedmoor Road, Ste. 300
                 Raleigh, NC 27612

The Honorable Scott Pruitt (via Certified Mail)
Attorney General of Oklahoma
313 Northeast 21st Street
Oklahoma City, OK 73105

The Honorable Peter Kilmartin (via Certified Mail)
Attorney General of Rhode Island
150 South Main Street
Providence, RI 02903

The Honorable Robert E. Cooper, Jr. (via Certified Mail)
Attorney General of Tennessee
425 Fifth Avenue, North
Nashville, TN 37243

The Honorable Greg Abbott (via Certified Mail)
Attorney General of Texas
300 West 15th Street
Austin, TX 78701

The Honorable Mark R. Herring (via Certified Mail)
Attorney General of Virginia
ATTENTION: Erica J. Bailey
           Chief of Civil Investigations
           Virginia Attorney General's Office
           900 East Main Street
           Richmond, VA 23219

The Honorable Bob Ferguson
Attorney General of Washington
1125 Washington Street, S.E.
Olympia, WA 98504-0100

The Honorable J.B. Van Hollen (via Certified Mail)
Attorney General of Wisconsin
State Capitol, Suite 114 E
Madison, WI 53707-7857